**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| **BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP** | ) | **Civil Action No. 05-195S** |
| **&** | ) | |
| **CENTERDALE MANOR ASSOCIATES LIMITED PARTNERSHIP,** | ) | |
| **Defendants.** | ) | |

**SUBMISSION OF INTERVENOR EMHART INDUSTRIES, INC.**
**REGARDING SCOPE OF DOCUMENTATION AND OTHER INFORMATION**
**NECESSARY TO REVIEW THE PROPOSED SETTLEMENTS/CONSENT DECREES**

Intervenor Emhart Industries, Inc. ("Emhart"), through its attorneys, respectfully submits the following points for the Court's consideration when determining what documents and information should be produced by the Plaintiff and the Defendants (collectively, the "Parties") for analysis by Emhart and consideration by the Court in deciding whether the Plaintiff's presently pending Motion to Enter Consent Decrees should be granted.

## BACKGROUND

### A. EMHART'S INVOLVEMENT AT THE CENTREDALE MANOR RESTORATION PROJECT SUPERFUND SITE

The United States Environmental Protection Agency ("EPA") notified Emhart in March

2000 of its potential liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*., for environmental contamination at the Centredale Manor Restoration Project Superfund Site ("the Site") in North Providence, Rhode Island, as the alleged successor to a chemical manufacturing facility at the Site. Emhart has been issued, and has substantially complied with, two Unilateral Administrative Orders and one Administrative Order on Consent issued by EPA pursuant to CERCLA § 106, 42 U.S.C. § 9606, and other authorities, asserting that Emhart is a responsible party at the Site under CERCLA § 107, 42 U.S.C. § 9607, and requiring Emhart to conduct "removal" (preliminary cleanup) activities at the Site.

Emhart has incurred substantial costs in connection with these removal activities and has continued to incur costs in connection with the Site.[1] Total costs associated with the Site may approach $50 million. Under CERCLA §§107 and 113, 42 U.S.C. §§9607 and 9613, Emhart is entitled to contribution toward these costs from other responsible parties, including the Defendants in this action.

## B. PRIOR PROCEEDINGS IN THIS ACTION

On behalf of the United States Environmental Protection Agency, the United States commenced this action against defendants Brook Village Associates Limited Partnership ("Brook Village") and Centerdale Manor Associates Limited Partnership ("Centerdale Manor") with the filing of its Complaint on May 6, 2005, asserting liability under CERCLA § 107, 42 U.S.C. § 9607.

Concurrently with the filing of the Complaint, the United States also filed a Notice of

---

[1] In addition to the response costs incurred directly by Emhart, which currently exceed $1 million, EPA has demanded payment from Emhart and others of sums in excess of $14.5 million in unreimbursed response costs that it allegedly has incurred.

Lodging Consent Decree and, on the same date, lodged with the Court proposed Consent Decrees with each of the two Defendants. Under 42 U.S.C. §122(i)(2), the lodging of the proposed Consent Decrees commenced a public comment period. On June 27, 2005, Emhart timely submitted comments to EPA objecting to the Consent Decrees and, on October 4, 2005, submitted supplemental comments addressing recent relevant developments.

The proposed Consent Decrees would release the Defendants from all governmental claims for response costs and natural resource damages that have been or will be incurred at the Site, and would provide contribution protection not only to the Defendants, but also to their current and former general and limited partners, and their officers and directors, among others.

On February 9, 2006, the United States filed a motion to enter the proposed Consent Decrees, a supporting memorandum, and a document entitled "U.S. Environmental Protection Agency's Response to Comments on Proposed Consent Decrees, February 2006" ("Response to Comments"). In its Motion, EPA stated that "[t]he settlements with Brook Village and Centerdale Manor are based on the limited ability to pay of those parties as determined by a qualified financial analyst hired by EPA and based on the analysis provided by Rhode Island Housing and Mortgage Finance Corporation."[2] (United States' Motion, at 2)[3] In its Response to Comments, EPA rejected Emhart's comments and objections, and EPA now seeks, through its

[2] The financial analyst referred to by EPA is Joan K. Meyer. Her Declaration is attached to the United States' Memorandum in Support of Its Motion to Enter Consent Decrees ("United States' Memorandum") as Appendix 2 and is referred to hereinafter as the "Meyer Declaration." The information provided by the Rhode Island Housing and Mortgage Finance Corporation is found in the Declaration of Carol Ventura (the "Ventura Declaration") in Appendix 3 to the United States' Memorandum.

[3] The Government added in its Memorandum, "The Consent Decrees provide that the settlements are appropriate because the Settling Parties have a limited ability to pay EPA's past and future response costs and Natural Resource damages and that the Consent Decrees require Defendants to pay the maximum they are able, while still continuing to provide affordable housing at the Site." (United States' Memorandum, at 7)

motion, entry of the proposed Consent Decrees.

Consequently, on February 22, 2006, Emhart filed a Motion to Intervene, along with a supporting memorandum of points and authorities, seeking leave to participate in the Court's consideration of the Government's Motion to Enter Consent Decrees and to provide to the Court in the course thereof Emhart's analysis of the proposed settlements/Consent Decrees. Following a hearing on April 3, 2006, the Court granted Emhart's Motion to Intervene. The Court also ordered Emhart and the Parties to provide the Court (by April 13 and April 20, respectively) with their views on (i) "what Emhart should be allowed to do in connection with their role as intervenors,"[4] taking into consideration the procedures followed in In re Acushnet River and New Bedford Harbor, 712 F.Supp. 1019 (D. Mass. 1989), and (ii) "additional information that could and should be provided to Emhart that would assist them in making the arguments they wish to make."

With respect to future proceedings in this matter, Emhart respectfully suggests that Emhart should be permitted to brief and argue the legal requirements applicable to the proposed Consent Decrees and the application of those principles to the particular circumstances presented in this matter. (Although an evidentiary hearing may not at this time appear to be needed, Emhart is willing to make its financial analyst available to the Court if the Court subsequently determines that additional information would be helpful.)

With respect to the information that should enable Emhart and the Court to review the proposed Consent Decrees thoroughly, expeditiously and without undue burden on the Parties, the remainder of this submission summarizes Emhart's concerns and, on that basis, suggests, with brief additional explanations, a short list of information and documentation that should be

---

[4] Transcript of Hearing of April 3, 2006, at 71.

provided by the Parties for analysis by Emhart and the Court.

## SUMMARY OF EMHART'S PRELIMINARY CONCERNS WITH THE PROPOSED SETTLEMENT/CONSENT DECREES

As the Court will recall from the April 3rd hearing, Emhart believes, on the basis of the limited information presented in the United States' Memorandum and the Meyer Declaration, that, at a minimum, the following concerns merit careful attention by the Court:

- The Meyer Declaration appears to rely on an erroneous analysis of the proposed Settlers' normal annual expenses and thereby appears to greatly underestimate each partnership's annual net income and associated cash flow. Our preliminary attempts at "normalizing" expenses and cash flow on the basis of the limited data presently available indicates that the partnerships have substantially greater (100% or more) "Available Income"[5] than EPA appears to have found (if it made such a determination at all).

- The Meyer Declaration does not address and thus fails to take into consideration the extraordinary expenses by Brooke Village Associates of $3,355,000 for "Legal and Professional Fees" between 1999 and 2003 and, further, appears to assume, without any apparent substantiation or explanation, that such expenses will continue at this extraordinary level in the future.

- The Meyer Declaration does not address and thus appears not to take into consideration the sharp annual decrease in Centerdale Manor Associates' annual interest expenses, which apparently reflects the imminent pay-off of its current mortgage and the freeing-up of substantial additional Available Income for remedial expenses at the Site.

- In reaching the proposed settlements, EPA deviated from its ATP Guidance by failing "to consider the entire financial picture of the ATP Candidate[s]," failing to analyze "related sources" including "an ATP Candidate's ability to obtain support from other entities that may be legally responsible for satisfying the environmental obligations of the ATP Candidate," and failing to comply with the requirement that "[o]wners' equity should also be analyzed" and "the financial resources of the general partners should be assessed." (ATP Guidance, at 4, 6, 16, 24)[6]

---

[5] United States Environmental Protection Agency, "General Policy on Superfund Ability to Pay Determinations" (September 30,1997) ("ATP Guidance"), at 12-13.

[6] Apparently because of her concern about this deviation from fundamental EPA requirements, Meyer makes the following disclaimer in her declaration: "EPA specifically requested that my

- In extending covenants not to sue and contribution protection to the general partners of the two partnerships as part of the proposed settlements, EPA has deviated from the requirement in its ATP Guidance that "the covenant [not to sue] and contribution protection should generally not extend to other PRPs such as a corporate parent or corporate shareholder (unless their assets and income are included within the ATP analysis and they are contributing to the settlement." (ATP Guidance, at 4)

- The Meyer Declaration provides no projection (*pro forma*) of the amount of revenue which would be available over a five-year period for payment of response costs at the Site if the partnerships continued to operate in their present fashion, even though Meyer provides a "*Pro Forma* Income Statement" and "Calculation of Proposed Contribution" for each partnership under the alternative "Refinancing Proposal." (*See* Tables C-1 and C-2 in Appendix C regarding Centerdale Manor Associates and Tables E-1 and E-2 in Appendix E regarding Brook Village Associates.)[7]

- The Meyer Declaration contains no examination of related party transactions on the part of either of the two partnerships, even though the ATP Guidance requires that "any related party transactions (i.e., transactions among natural persons related to each other, or among corporations that are closely related) are identified." (ATP Guidance, at 24)

- Neither the Meyer Declaration nor the Ventura Declaration provides any examination or explanation of the unusually high 8.5% interest rate on the mortgages which each of the partnerships would undertake under the "Refinancing Proposal" embodied in the proposed settlements.

- Neither the Meyer Declaration nor the Ventura Declaration provides a substantive explanation of, let alone a convincing justification for, diversion of approximately 65% of the proceeds of each proposed mortgage to non-environmental expenditures.

- The Meyer Declaration relies on financial data only from the 1999-2003 period and thus fails to provide any information about the current financial condition and

---

analysis focus on the financial capabilities of the limited partnership entities without further investigating the ability to pay of the general partners of either Centerdale Manor Associates or Brook Village Associates." (Meyer Declaration, at 1-2) Meyer's concern is understandable. For example, the 2004 and 2005 audited financial statements for Centerdale Manor Associates which were provided this week by the Rhode Island Housing and Finance Corporation show partners' equity in the amounts of $2,700,000 at the end of 2004 and $3,100,000 at the end of 2005.

[7] "The Agency should normally require an ATP Candidate to direct five years of Available Income toward payment of the proposed settlement amount." (ATP Guidance, at 12)

operating results and prospects of the two partnerships, even though the ATP Guidance requires EPA to consider "a minimum of the five most recent years of federal corporate income tax returns [and] . . . the five most recent years of financial information (audited, if available) and a completed financial questionnaire." ATP Guidance, at 22.

- In reaching the proposed settlements, EPA appears to have deviated from its ATP Guidance by failing to determine "the full amount sought by EPA" from each prospective Settler – *i.e.*, the full amount which the would be settlers would be liable for if they are not qualified for Ability-To-Pay settlements. (*Id.*, at 3.)

Emhart believes that these and similar questions must be evaluated in order to determine whether the proposed settlements/Consent Decrees are reasonable, fair, and consistent with CERCLA's purposes.

## EMHART'S PROPOSAL REGARDING INFORMATION AND DOCUMENTATION TO BE PROVIDED BY THE UNITED STATES AND THE DEFENDANTS

In light of the foregoing and other concerns, Emhart believes that the following limited information and documentation should be provided by the Parties to Emhart and the Court for review and analysis:

### A. DOCUMENTATION

1. <u>EPA's case file relating to the decision to enter into ATP settlements with each of the two partnerships, including but not limited to EPA's ATP analysis and its narrative description of that analysis</u>.

EPA's ATP Guidance provides (at 14-15):

> The case team should document the ATP decision in Superfund settlements. Under CERCLA, costs not recovered from one PRP may be recovered from other PRPs. . . . Therefore it is important for the case team to document the basis for the ATP settlement, including identifying and maintaining copies of all documents relied upon in conducting the ATP analysis as well as preparing a narrative explanation that describes the analysis.

As reflected in EPA's own ATP Guidance, files and records maintained by EPA personnel relating to (i) EPA's negotiations with representatives of the two partnerships, (ii)

EPA's contacts with others acting on behalf of one or both of the partnerships, (iii) EPA's various analyses of the ATP Candidates' financial condition, (iv) EPA's projections, if any, of the partnerships future operations in their present manner, without the proposed financings, and (v) EPA's analyses of the proposed financings and related arrangements are essential to evaluating the fairness of the proposed settlements/Consent Decrees, especially in light of EPA's apparent disregard of its own ATP Guidance in crucial respects from the very beginning of its consideration and negotiation of the proposed ATP resolution, in light of the many questions appearing on the face of but left unanswered by the Meyer Declaration and the summary financial Tables attached thereto, and in light of the arguably extraneous considerations which have influenced and appear to have short-circuited the normal ATP settlement process, as reflected in both the Meyer Declaration and the Ventura Declaration.[8]

2. <u>All documents submitted by or on behalf of each of the two partnerships in connection with the request for and negotiation of the proposed settlement/Consent Decrees</u>.

EPA's ATP Guidance provides (at 3-4):

> The ATP Candidate will be required to provide adequate information to substantiate that payment of the amount EPA seeks is likely to create an undue financial hardship. . . . [A]ny PRP who is attempting to settle under the ATP process may be required to assist EPA in defending the settlement, if the settlement is challenged. The Candidate should recognize that it may be required to authorize release of financial

[8] The contents of this file presumably should include all of the documents in the next Documentation Item (*i.e.,* No. 2) and most or all of the other documents and informational items identified hereinafter, thus obviating the need for their separate production. At the hearing, the Court suggested that the files of the Rhode Island Housing and Finance Corporation might contain most or all of the pertinent information needed to evaluate the proposed Consent Decrees (Hearing Transcript, at 71), and Emhart has now reviewed those files. Although the Corporation's files contained some pertinent financial data normally utilized by the Corporation in its housing-related activities (*see* n.6, *supra* and n.10, *infra*), the Corporation's files do not contain the data and other information submitted to and relied upon by EPA in the course OF its analysis of the proposed settlements and its negotiations with the ATP Candidates. However, the information contemplated by the Court should be available in EPA's case file and, in the Court's words, should "not [be] unreasonable to obtain. . . ." (Hearing Transcript, at 71)

> information necessary to defend the settlement. Where appropriate, the Agency will be willing to address confidentiality concerns by seeking to obtain protective orders, in camera review, or similar techniques.[[9]]

EPA's ATP Guidance clearly recognizes that financial and other information submitted by ATP Candidates such as the two Defendants in this action is central to EPA's consideration of ATP settlements and therefore of the Court's review of such proposed settlements/Consent Decrees. The need for such documentation is underscored in this instance because of the same considerations as discussed with respect to Documentation Item No. 5, *supra*.

3. Audited financial statements of each of the two partnerships for 2004 and 2005.[10]

As noted above, the Meyer Declaration lacks any information regarding the most recent operating results of the two partnerships. Determining whether the partnerships can contribute more to cleanup costs at the Site by continuing to operate on their current basis instead of entering into the contemplated financings is impossible without current operating results as reported in the 2004 and 2005 financial statements.

4. Most recent 2006 monthly balance sheet and income statement for each of the two partnerships.

These documents are needed for the same reasons discussed in connection with Documentation Item No. 3, *supra*, as well as the requirements of EPA's ATP Guidance, *supra*.

---

[9] Emhart is willing, of course, to enter into an appropriate confidentiality agreement with the Parties or to jointly submit with the Parties a proposed protective order for the Court's consideration.

[10] The Rhode Island Housing and Mortgage Finance Corporation has already produced copies of the 2004 and 2005 audited financial statements of Brooke Village Associates and the 2004 audited financial statements of Centerdale Manor Associates. Thus, there is no need for these documents to be produced again.

5. Copies of the current partnership agreement of each of the two partnerships.

These documents may identify the limited partners of the two partnerships and thereby make it possible to identify related party transactions and determine the actual profits being realized by the general partners, who may also be limited partners or hold interests, directly or indirectly, in the limited partners which have invested in each of the two partnerships.[11]

6. Rhode Island Housing Underwriting Model for each partnership (dated July 6, 2004 for Brook Village and November 11, 2004 for Centerdale Manor), including any updates.

These calculations and related data provide the only means of understanding and evaluating the proposed financings which are central to the proposed settlements/Consent Decrees.

**B. OTHER INFORMATION**

1. A schedule identifying all partners of each of the two partnerships including each partner's partnership or ownership percentage interest and including each partner in or owner of each investor partnership.[12]

As discussed in connection with Document Item No. 5, *supra*, this information, if not disclosed in the partnership agreements, is essential to reaching accurate conclusions regarding related party transactions and regarding the actual profits being realized by the general partners, who may also be limited partners or hold interests, directly or indirectly, in the limited partners which have invested in each of the two partnerships.

2. A schedule of persons or entities identified in Information Item No. 1 that are related parties under section 207 of the Internal Revenue Code.

Consistently with EPA's ATP Guidance (at 6), this information is needed for the same reasons discussed in connection with Information Item No. 1, *supra*.

---

[11] *Cf.* Information Item No. 1, *infra*.

[12] This request can be dispensed with if the requested information is contained in the partnership agreements requested as Document Item No. 5, *supra*.

3. A schedule detailing any related party transactions between any of the persons or entities identified in Information Item No. 1, and/or between any of the persons or entities identified in Information Item No. 1 and any entity directly or indirectly owned or controlled by any of the persons or entities identified in Information Item No. 1.

This information is needed for the same reasons discussed in connection with Information Items No. 1 and 2, *supra*.

4. An explanation or schedule(s) detailing certain major but unexplained expenses which appear in the summary tables in the Meyer Declaration:[13]

Since the amount of "Available Income" for response costs at the Site is the crucial determination which EPA is charged with making, deduction of Centerdale Manor's "Environmental expenses" from the "Total revenue," as Meyer has done, is presumptively erroneous. Under EPA's ATP Guidance, "Questionable revenues and expenses are to be discussed with the ATP Candidate and may result in adjustments to the income statement estimate." ATP Guidance, at 11. Yet the Meyer Declaration does not even allude to Centerdale Manor's "Entity expenses (which sky-rocketed from $5000 in 2002 and preceding years to $80,000 in 2003) reported in Table B-1 or to the $3,355,000 in "Legal and professional fees" or any other of Brooke Village's "questionable expenses" revealed in Table D-1.

**CONCLUSION**

For the reasons stated above, and for such other reasons as may appear to the Court, Emhart respectfully requests that the Court order the United States and the Defendants to provide to Emhart the Documentation and the Other Information identified above.

---

[13] These would include Centerdale Manor's "Environmental expenses" and "Entity expenses" in 2001-2005 as disclosed in Table B-1 in Appendix B to the Meyer Declaration and Brook Village's "Antenna rental and insurance" income, $3,555,000 in "Legal and professional fees," "Insurance recoveries" as well as other pertinent information regarding actual and potential insurance recoveries, and "Partnership income – PRP/interest expense" income in 1999-2005 as disclosed in Table D-1 in Appendix D to the Meyer Declaration.

Respectfully submitted,

EMHART INDUSTRIES, INC.

By Its Attorneys,

Craig M. Scott sm

Craig M. Scott, Esq. (#4237)
DUFFY SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

Warren Anthony Fitch sm

Warren Anthony Fitch, Esq. (admitted *pro hac vice)*
L. Misha Preheim, Esq. (admitted *pro hac vice)*
BINGHAM McCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
(202) 373-6000, -6695
(202) 373-6001 (Facsimile)

**CERTIFICATE OF SERVICE**

I certify that on the 13th day of April, 2006, I caused a true copy of this Submission to be forwarded to the following by electronic mail and first class mail, postage prepaid:

Jerome MacLaughlin, Esq.
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Henry.Friedman@usdoj.gov

Eve Vaudo, Esq.
Enforcement Counsel
U.S. Environmental Protection Agency
New England Region
One Congress Street
Suite 1100 (SES)
Boston, MA 02114-2023
vaudo.eve@epamail.epa.gov

Laurie Burt, Esq.
Foley Hoag
Seaport World Trade Center
155 Seaport Blvd.
Boston, MA 02210-2600
lburt@foleyhoag.com

Richard J. Welch
Moses & Afonso
170 Westminster Street, Suite 201
Providence, RI 02903
rwelch@mosesafonso.com

William S. Eggeling
Ropes & Gray LLP
30 Kennedy Plaza
Providence, RI 02903
William.Eggeling@ropesgray.com

Howard J. Castleman, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
Hcastleman@brownrudnick.com

Michael Milito, Esq.
Rhode Island Housing and Mortgage Finance Corporation
44 Washington Street
Providence, RI 02903
mmilito@rihousing.com

Brian Wagner, Esq.
Rhode Island Department of Environmental Management
235 Promenade Street
Providence, RI 02908-5767
brian.wagner@dem.ri.gov

Terrence Tierney
Assistant Attorney General
RI Department of the Attorney General
150 North Main Street
Providence, RI 02903
Ttierney@riag.ri.gov

James P. Ray
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
jray@rc.com

