IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,

Plaintiff,

v.

BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP, ET AL.

Defendants.

CIVIL ACTION NO. 05-195S

**REPLY OF CENTERDALE MANOR ASSOCIATES AND BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP TO EMHART'S OPPOSITION TO MOTION TO ENTER CONSENT DECREES**

Centerdale Manor Associates ("Centerdale Manor") and Brook Village Associates Limited Partnership ("Brook Village") (collectively, the "Settling Defendants") submit this memorandum in response to Emhart's Objection to entry of the proposed Consent Decrees. For all of the reasons stated in the prior filings of the United States[1] and the Settling Defendants, the consent decrees between the United States and Centerdale Manor and Brook Village (the "Consent Decrees" or the "Decrees") are fair, reasonable, and consistent with the purposes of CERCLA. Nothing in the objections filed by Emhart demonstrates otherwise.

Emhart's objections to the Decree are unsupported in either fact or law. In a hypothetical world where concepts such as debt service and facility renovation costs do not exist and the financial viability of two elderly housing projects are not at stake, more money might be

[1] The United States Memorandum in Support of its Motion to Enter Consent Decrees ("United States Memorandum"), and EPA's Response to Comments (February 2006) attached thereto ("EPA's Response to Comments").

available to fund the cleanup of the site. However, Rhode Island Housing and Mortgage Corporation ("Rhode Island Housing"), using its standard methodology, determined the maximum amount that was available from the Settling Defendants through a refinancing, while still maintaining the project for affordable housing. EPA's expert, Dr. Joan Meyer, confirmed that the amount made available through the refinancing was indeed the maximum amount available from the Settling Defendants, consistent with Rhode Island Housing's underwriting and refinancing requirements. Meyer Declaration, ¶ 4. Dr. Meyer has reviewed the Declaration of Mr. Wesley Stallings filed on behalf of Emhart. She identified several significant flaws in Mr. Stallings' analysis and her conclusions remain unchanged. Rebuttal Declaration of Joan K. Meyer ("Meyer Rebuttal").

The Settling Defendants are two long-standing providers of affordable housing for the elderly. They came to the site after industrial operations ceased. They are thus differently situated than Emhart and other industrial entities who either operated the industrial facilities that formerly existed or sent hazardous substances to those facilities. Exhaustive analysis has shown that they have a limited ability to pay while continuing to operate the affordable housing. EPA has determined that there are substantial public policy reasons to maintain affordable elderly housing at the site. In these circumstances, review of the facts underlying the Decrees reveals that EPA's decision to settle with these two Section 8 housing providers was reasonable. The Consent Decrees should be entered.

## <u>Argument</u>

### I. The Standard of Review

Emhart's discussion of applicable case law is disingenuous. While Emhart grudgingly concedes that EPA's decision to enter into the consent decree is entitled to "some deference,"

Emhart Memorandum at 7, Emhart fails to note that controlling First Circuit precedent is that such decisions by EPA are entitled to "considerable deference." United States v. Davis, 261 F.3d 1, 21 (1st Cir. 2001), *citing* United States v. Cannons Engineering Corp., 899 F.2d 79, 84 (1st cir. 1990) ("the district court must refrain from second-guessing the Executive Branch").

The Settling Defendants have never suggested, as Emhart claims, that this Court should serve as a rubber-stamp for the Decrees. To the contrary, the Settling Defendants have supported thorough judicial review of the Decrees and the underlying rationale for the settlements. However, once the Court has performed such review, the Decrees should be entered unless that review reveals that EPA abused the deference that Congress has determined EPA's settlement decisions should be given.

## II. The Consent Decree Is Procedurally Fair

Emhart is similarly misleading in its citation of case law regarding the procedural fairness of the Decree. Emhart quotes a passage from the District Court decision in Davis, in which the court noted that consent decrees will be considered procedurally fair where they have resulted from arms-length negotiations that included the non-settlors. Emhart Memorandum at 8, *citing* United States v. Davis, 11 F. Supp. 183, 189 (D. R.I. 1998). Emhart is clearly implying that any settlement negotiations that do **not** include all parties at the table at the same time are **not** procedurally fair. Nothing could be further from the truth. Controlling First Circuit precedent demonstrates the falsity of Emhart's implication. In Cannons Engineering, the First Circuit stated that:

> "divide and conquer" has been a recognized negotiating tactic since the days of the Roman Empire, [footnote omitted] and in the absence of a congressional directive, we cannot deny the EPA use of so conventional a tool. So long as it operates in good faith, EPA is at liberty to negotiate and settle with whomever it chooses.

Cannons Engineering, 889 F.2d at 93. There was nothing improper about EPA's decision to enter into separate negotiations with the two Section 8 housing providers -- which, unlike Emhart and the ten other identified potentially responsible parties ("PRPs"), had no role in bringing hazardous substances to the Site.[2] Nor, having made that decision, was there anything improper about EPA's decision not to inform Emhart or the other PRPs of the settlement negotiations prior to the period for public comment.

## III. The Decree is Substantively Fair

The Consent Decrees fairly resolve the Settling Defendants' liability under CERCLA. First, EPA, relying on its well qualified expert and the determinations made by the Rhode Island Housing and Mortgage Corporation ("Rhode Island Housing"), concluded that the Settling Defendants have a limited ability to pay clean-up costs while continuing to operate the Section 8 housing for the elderly. Second, even aside from the Settling Defendants' limited ability to pay, the settlements fairly reflect the Settling Defendants' status as peripheral parties who came to the Site to provide affordable elderly housing after industrial operations involving hazardous substances had ceased. They thus have substantial defenses to CERCLA liability. Given that Centerdale Manor and Brook Village have already spent more than $1 million with respect to the Site and will collectively pay an additional $4.1 million to the United States and the State of Rhode Island, the Decrees are substantively fair.

[2] EPA explained that its decision to negotiate separately with Brook Village and Centerdale Manor was in part based precisely on the fact that the Settling Defendants, as Section 8 housing providers who came to the site after industrial operations had ceased, were categorically different than the industrial operators who caused the releases of hazardous substances in the first instance. United States Memorandum, at 19.

A. EPA's Decision to Enter Into Ability to Pay Settlements was Correct

1. The Settlement Payments Accurately Reflect Defendants' Limited Ability to Pay

The Decrees capture for EPA, the State, and the Natural Resources Trustee, the maximum amount of money available from the refinancing of the two Settling Defendants' Section 8 housing facilities at the Site, consistent with federal and state requirements for these housing projects. *See*, Consent Decrees, Section VI, ¶ 5. The Decrees are thus substantively fair. Emhart's hodgepodge of arguments fail to address this fundamental reality underlying the settlements.

EPA has made a policy decision that the public interest would be best served by enabling Centerdale Manor and Brook Village to maintain affordable housing, while resolving their potential CERCLA liability to the United States and the State of Rhode Island. This was a reasonable policy decision by EPA, supported by comments on the Decree by U.S. Senator Chafee and Representatives Kennedy and Langevin. The Decrees require Centerdale Manor and Brook Village to maintain affordable housing at the Site for an additional 40 years.

Having made this decision, EPA then made two related determinations. First, EPA concluded that it wanted to receive a one-time cash payment, rather than assume the risk inherent in the alternative -- a stream of payments over time. As noted in the Meyer Rebuttal, ¶¶ 11, 14, this too was a reasonable decision, entitled to judicial deference.

Second, EPA determined that both Settling Defendants had a limited ability to pay. Congress has made clear that in reaching such settlements EPA may consider a PRP's ability to "pay response costs and still maintain its basic business operations". CERCLA, Section

122(g)(7), 42 U.S.C. § 9622(g)(7).[3] The only way to maintain the facilities as affordable housing was to go through a Preservation Refinancing by Rhode Island Housing. Using its standard methodology for assessing the income available to finance a mortgage, Rhode Island Housing determined the maximum amount available for settlement from the refinancing, while restoring the projects to a sound financial position on a going forward basis . In other words, Rhode Island Housing determined the amount of new debt, capital and reserves that would be needed to refinance and preserve the projects for the future, while at the same time generating the maximum amount of equity that could be converted to cash for the settlement.

From an economic point of view, the one-time payment available through the refinancing should generally be the same as the present value of the stream of payments represented by the income of Brook Village and Centerdale Manor. Meyer Rebuttal, ¶ 11. In fact, Rhode Island Housing has concluded that once the need to service the debt (including 20% coverage to deal with unforeseen events or variability in income), the amount made available through the refinancing is, indeed, the maximum amount available from the income of these two Section 8 housing providers.

Moreover, EPA independently reviewed Rhode Island Housing's determinations. Dr. Meyer concluded that the amount available through the refinancing represents the Settling Defendants' ability to pay. Her conclusions are unchanged after reviewing Mr. Stallings' Declaration, and for good reason.

---

[3] *See*, Interim Guidance on Ability to Pay and De Minimis Revisions to CERCLA 122(g) by the Small Business Liability Relief and Brownfields Revitalization Act (May 17 , 2004), at 6 (EPA will apply the same ability to pay ("ATP") guidelines for all ATP parties, *de minimis* and non- *de minimis*, "to the extent practicable and in the public interest")

In its brief, Emhart argues that Centerdale Manor and Brook Village should be required to dedicate to the EPA settlement five years of its "weighted average annual cash flow". However, Emhart's calculation of a "weighted average annual cash flow" omits any cost to Brook Village and Centredale Manor of the significant capital improvements that Rhode Island Housing will require as part of the maintenance of these Section 8 facilities. Meyer Rebuttal, ¶ 14. As required by Rhode Island Housing, Brook Village and Centredale Manor performed Capital Needs Assessments which identified approximately $2.2 million worth of building rehabilitation that should be performed in the next few years ($1,335,000 for Centredale Manor and $873,000).

Second, Emhart's calculation of available cash flow available ignores the risks faced by the government in relying on future payments from income, rather than a current one-time payment. In particular, there have been significant upward cost trends facing providers of multi-family housing, including increases in taxes and fuel costs. Meyer Rebuttal, ¶14; Meyer Declaration, Tables B-1, D-1 (showing, for example, a 98% increase in the cost of fuel oil for Brook Village from 1999-2003). Since, 2003, the cost of fuel has risen even more dramatically.

Such cost increases provide just one reason why Emhart's assumption that 100% of the "average annual cash flow" from Centredale Manor and Brook Village will be available for payment to EPA is improper. Such an assumption is contrary to standard financial practice, as demonstrated by both the Meyer Declaration and the Rhode Island Housing policy to require a 20% operating cushion in estimating the ability of an affordable housing provider to repay debt obligations. Meyer Rebuttal, n. 11. Requiring Centerdale Manor and Brook Village to operate without such a cushion would be imprudent.

In sum, Emhart's calculations: (1) assume more money will be available to fund a settlement than would in fact be the case and (2) ignore the risk that would be assumed by EPA if a settlement were based on an income stream over time rather than a one-time up-front payment. EPA's determination of the amounts available from the Settling Defendants is not only defensible, it is clearly correct.

2. Analysis of Other Uses of the Site Would Be Improper

To the extent that Emhart believes that more money would be available if the projects ceased to provide affordable housing, two responses are appropriate. First, EPA's policy judgment that maintenance of affordable housing for the elderly is important is itself entitled to deference.

Second, the purpose behind Emhart's objection to the Decree is to enable Emhart to pursue contribution claims against the Settling Defendants. As noted in the Settling Defendants' Joint Opposition to Motion by Emhart to Intervene, EPA is entitled to question what market-based financial institution would provide financing to the Settling Defendants with the threat of unresolved liability to EPA and the threat of Emhart's contribution litigation hanging over the properties that would be the collateral for such financing.[4]

<u>B. EPA Correctly Determined that the Settling Defendants are Peripheral Parties</u>

EPA also determined that it was appropriate to enter into the Decrees because the Settling Defendants qualify as "peripheral parties" under EPA's "Guidance on Administrative Response Cost Settlements under Section 122(h) of CERCLA and Administrative Cashout Settlements

---

[4] RIH, even with the incentive to ensure the continued supply of affordable housing, would not provide the Preservation Refinancing that is the source of the settlement funds without entry of the Decrees. <u>See</u> EPA's Response to Comments, p. 18, and App. 3, Declaration of Carol Ventura, ¶ 26.

with Peripheral Parties under Section 122(h) of CERCLA and Attorney General Authority," September 30, 1998 ("Peripheral Party Guidance"). United States Memorandum at 29-30. Thus, even aside from Centerdale Manor's and Brook Village's limited ability to pay, the Peripheral Party Guidance provides an additional and independent ground for entry of the Decrees. A peripheral party is "one who for equitable, financial or other reasons is not the primary focus of Superfund enforcement activities at the site." Peripheral Party Guidance, at 8.

Settlements with peripheral parties are justified with respect to defendants for whom "unresolved CERCLA liability would be an extreme burden and for whom equitable or public interest considerations argue in favor of speedy settlement."[5] Id. EPA has concluded that preservation of affordable elderly housing at the site is a compelling public interest which justifies these settlements. See, US Memorandum, at 29-31.

Furthermore, section 122 of CERCLA authorizes settlements that are in the "public interest." 42 U.S.C. § 9622(a). EPA has reasonably interpreted the phrase "public interest" to include considerations other than CERCLA's environmental purposes. The term "public interest" is not defined in CERCLA. Therefore, under Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984), EPA's reasonable interpretation of the term to include such broader concerns is entitled to deference.

Because imposition of liability on the Settling Defendants beyond what is required in the Decrees[6] would impose an "extreme burden" on the Settling Defendants and could threaten the

---

[5] In its Objection, Emhart does not challenge EPA's determination that the unresolved CERCLA liability would be an "extreme burden" for the Settling Defendants and that "equitable or public interest considerations argue in favor of a speedy settlement," other than to state in conclusory fashion that that portion of EPA's Peripheral Party Guidance is "inapplicable here." Emhart Objection, at 17 n.14.

[6] As noted by EPA, in addition to the payments required under the Decrees, the Settling Defendants have already paid more than $1 million each towards the cleanup of the Site. United States Memorandum, at 30. EPA was

continued existence of affordable housing at the site, the Peripheral Party Guidance applies here and provides further support for EPA's decision to enter into the Decrees.

C. Entry of These Settlements is Not Premature

Contrary to Emhart's claim, the proposed settlements are not "premature." EPA's proposed settlement comes almost 7 years after EPA identified Brook Village and Centerdale Manor as potentially responsible parties because of their status as owners of a portion of the Site. During the 7 years, EPA has exhaustively studied the Site and ordered several interim response activities. In addition, EPA has identified as PRPs ten companies that were responsible for the presence of hazardous substances at the Site. During that time, Brook Village and Centredale Manor have complied with EPA clean-up orders, each spending well over $1 million in remediation and legal costs. These costs have exhausted project reserves and caused the providers of elderly housing to incur additional debt. With the assistance of an experienced economist, EPA determined that Brook Village and Centredale Manor have a limited ability to pay further response costs while continuing to operate the properties as qualified Section 8 housing for the elderly. In these circumstances, nothing in CERCLA requires EPA to wait until it has selected the final Site remedy, or until the providers of elderly housing are formally declared to be insolvent, before settling their potential liability. *See United States v. Davis*, 261 F.3d at 24 ("data on the total extent of the harm and the respective liabilities of various PRPs are often unavailable. Such difficulties will not preclude a court from entering a consent decree"). Thus, far from being premature, these settlements are timely, if not too long delayed.

---

entitled to consider such payments in determining whether additional payments would constitute an "extreme burden" on the Settling Defendants.

Emhart's argument that EPA did not have sufficient information about the financial status of New England Container Corporation is similarly unavailing. The financial status of one responsible party is irrelevant to whether EPA has reasonably exercised its discretion in entering into ability to pay settlements with two other persons. In fact, this comment merely highlights Emhart's true concern -- that it might have to pay more than it would like, because other parties have limited ability to pay. However, that is no reason for this Court not to enter these settlements.[7]

D. EPA Took Into Account the Settling Defendants' Potential Liability

Emhart is wrong that EPA "failed to consider the defendants' actions" in allegedly exacerbating contamination at the Site. Here too, the flaws in Emhart's arguments are emblematic and actually demonstrate why the Decrees should be entered. Emhart made these same comments in response to the public lodging of the Decrees. EPA responded to them in the Response to Comments. See Response to Comment number 5, attached to United States' Motion to Enter Consent Decrees. In its response, EPA noted that "any incidental involvement by the Settling PRPs in the contamination as a result of construction activities is significantly different from that of the remaining PRPs, including Emhart, whose hazardous substances were disposed of on-site." Id., at 16-17.

That Emhart doesn't like EPA's response does not justify the bald allegation that EPA failed to consider Emhart's arguments. EPA expressly considered, and resolved through these

---

[7] Similarly, Emhart provides no evidence that these settlements will make it more difficult for EPA to obtain an overall settlement that will fund the complete cleanup. Indeed, there are at least 10 other business entities, in addition to Emhart, that have been named as responsible parties in connection with the Site. It is worth noting that none of these parties have objected to these Consent Decrees, a factor relevant to the overall fairness and reasonableness of the settlements. *See*, In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1027 (D. Mass 1989). The mere fact that the settlements may mean that Emhart will pay more than it would like does not mean that obtaining such an overall settlement will be more difficult for EPA; rather, it means only that such a settlement may be more costly to Emhart.

Decrees, the litigation risks posed by the Settling Defendants' assertions of defenses to liability under CERCLA. These risks include Brook Village's assertion of its Innocent Landowner Defense (a complete defense to any liability under CERCLA) as well as Brook Village's Section 106(b) Petition for Reimbursement from EPA of $575,000 in response costs, which petition is pending before the EPA's Environmental Appeals Board. As the United States acknowledged in its Memorandum supporting entry of the Decrees:

> If successful, Brook Village would receive reimbursement of up to the $575,000 it sought in its petition, plus interest and EPA would likely be foreclosed from seeking any other contribution from Brook Village. Having acquired the property after all industrial activity on the property had ceased, Brook Village may be in a position to satisfy some of the prerequisites of the innocent landowner defense.

United States Memorandum, at 17. Similarly, EPA has also considered, and resolved through these Decrees, the litigation risks posed by Centredale Manor's assertion of a divisibility defense. *See* Brief of Centredale Manor in Support of United States' Motion to Enter Consent Decrees ("Centerdale Manor Brief"), pp. 4-7.[8] Nowhere in its Objection does Emhart provide a basis for concluding that EPA abused its discretion in resolving those litigation risks by obtaining over $4.1 million in settlement payments through entry of the Decrees.

---

[8] Although not directly controlling concerning EPA's potential claims against the Settling Defendants, it is also worth noting that courts have often upheld equitable allocations where passive owners, such as the Settling Defendants, have been allocated a zero or near zero share of liability. *See* PMC, Inc. v. Sherwin-Williams, 151 F.3d 610, 616 (7th Cir. 1998) (district court's allocation of nearly zero share to an owner was not clearly erroneous). Gopher Oil Co. v. Union Oil Co. of Cal., 955 F.2d 519, 523, 527 (8th Cir. 1992) (where prior owner responsible for contamination, current owner allocated zero liability); Waste Mgmt of Alameda County, Inc. v. East Bay Reg'l Park Dist., 135 F. Supp. 2d 1071, 1091 (N.D. Cal. 2001). ("mere fact of current ownership is not usually considered a significant factor in weighing in favor of a large share of liability"); *See also* Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 871, 884 (9th Cir. 2001)(en banc) (explaining that CERCLA's equitable allocation rules are set up such that a "PRP with minimal responsibility – such as an owner without culpability but outside the technical parameters of the innocent landowner defense – does not get stuck with more than his fair share of the financial responsibility for clean-up.")

E. EPA's Decision Not to Require Payment by the Individual Partners was Correct

Finally, Emhart's challenge to EPA's decision not to seek payments from the individual partners of the Settling Defendants also fails. In essence, Emhart argues that any party that has invested and benefited financially in these two elderly housing projects are fair targets for CERCLA liability. Emhart's complaint is with the basic financial structure of Section 8 affordable housing in Rhode Island and, indeed, in the United States. Section 8 housing is a unique public/private partnership, the success of which depends on attracting private investment to build and maintain affordable housing projects, such as Brook Village and Centerdale Manor. The financial incentives and benefits must be sufficient to attract private investors to commit to what is a highly regulated, long term investment.

Here, the Decrees require that the investors give up their equity investment of over 25 years to fund the settlement and start over with new 30 year mortgages and a new 40 year commitment to keep the projects as affordable housing. This is significant consideration, by any measure. To pursue these partners individually in addition would be punitive, unwarranted, and not in the public interest. What rational investors would commit private capital to future affordable housing projects, many of which are located in urban redevelopment areas, if such an investment placed them at risk of personal CERCLA liability?[9] For these reasons, EPA determined that it was in the public interest to release the individual investors in the Settling Defendants from any potential liability for the Site.

---

[9] See Ventura Declaration, ¶ 27 ("Holding the investors in Centerdale Manor and Brook Village individually responsible for contamination of these properties prior to their ownership would have a potentially chilling effect on the willingness of the private market to invest in our developments.")

## IV. The Decrees are Reasonable

The United States Memorandum documented why the Decrees are reasonable. As the United States noted therein, and as discussed above, consideration of litigation risk is one component of the United States' reasonableness determination. The Settling Defendants incorporate herein and refer this Court to Brook Village's Memorandum in Support of United States' Motion for Entry of Consent Decree and the Centerdale Manor Brief, previously filed with this Court, for additional detail concerning the litigation risk faced by the government with respect to each Settling Defendant. As noted in the Centerdale Manor Brief, this Court need not fully agree with the United States' assessment of litigation risk; the government has wide discretion in assessing the costs and benefits of litigation.

## Conclusion

For all of the above reasons, as well as those stated in the United States Memorandum, the settlement is fair, reasonable and in the public interest, and this Court should allow the United States' motion to enter the Consent Decree.

Respectfully submitted,

BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP

By its attorneys,

William S. Eggeling (RJW)

William S. Eggeling (RI Bar #4008)
ROPES & GRAY LLP
30 Kennedy Plaza
Providence, RI 02903
(401) 455-4400
William.Eggeling@ropesgray.com

Howard J. Castleman (RJW)

Howard J. Castleman (Pro Hac Vice)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
howard.castleman@hklaw.com

Dated: June 28, 2006

CENTERVILLE MANOR ASSOCIATES LIMITED PARTNERSHIP

By its attorneys,

Richard J. Welch

Richard J. Welch, Esq. (RI Bar #4497)
MOSES AFONSO JACKVONY, LTD.
170 Westminster Street, Suite 201
Providence, RI 02903
Phone: (401) 453-3600
Fax: (401) 453-3604

Laurie Burt (RJW)

Laurie Burt, Esq. (Pro Hac Vice)
Seth D. Jaffe, Esq. (Pro Hac Vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000

Dated: June 28, 2006

**CERTIFICATE OF SERVICE**

I, Richard J. Welch, hereby certify that copies of this Reply Brief were served on June 28, 2006, by first-class mail, postage prepaid, and by electronic mail, as follows:

Jerome W. MacLaughlin
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
jerry.maclaughlin@usdoj.gov

Eve Vaudo
Enforcement Counsel
U.S. Environmental Protection Agency
New England Region
One Congress St., Suite 1100
Boston, MA 02114-2023
vaudo.eve@epamail.epa.gov

Laurie Burt
Foley Hoag LLP
Seaport World Trade center
155 Seaport Blvd.
Boston, MA 02210-2600
lburt@foleyhoag.com

William S. Eggeling
Ropes & Gray LLP
30 Kennedy Plaza
Providence, RI 02903
william.eggeling@ropesgray.com

Howard J. Castleman
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
howard.castleman@hklaw.com

Michael Milito
Rhode Island Housing and Mortgage Finance Corp.
44 Washington Street
Providence, RI 02903
mmilito@rihousing.com

Brian Wagner
Rhode Island Department of
Environmental Management
235 Promenade Street
Providence, RI 02908-5767
brian.Wagner@dem.ri.gov

Terrence Tierney
Assistant Attorney General
R.I. Department of the Attorney General
150 North Main Street
Providence, RI 02903
Ttierney@riag.ri.gov

Jerome C. Muys, Jr.
Swidler Berlin
The Washington Harbour
3000 K Street, N.W., Suite 300
Washington, D.C. 20007-5116
jcmuys@swidlaw.com

Craig Scott
Duffy Sweeney & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903
cscott@duffysweeney.com

James P. Ray
Robinson & Cole LLP'
280 Trumbull Street
Hartford, CT 06103-3597
jray@rc.com

Richard J. Welch

B3222646.2