IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 05-195S |
| BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP, ET AL. | ) | |
| Defendants. | ) | |

**PLAINTIFF UNITED STATES' REPLY TO INTERVENOR EMHART INDUSTRIES', INC. OPPOSITION TO MOTION TO ENTER CONSENT DECREES**

The United States submits this Reply to Intervenor Emhart Industries' ("Emhart") Opposition to the United States Motion to Enter Consent Decrees filed February 9, 2006. In the United States' forty-three page Memorandum in Support of its Motion to Enter, and in the attached twenty-four page United States Environmental Protection Agency's ("EPA") Response to Comments on Proposed Consent Decrees, the United States has addressed the majority of issues raised by Emhart in its Opposition as Emhart was provided, and took full advantage of, the public comment process required by the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") § 122(d)(2), 42 U.S.C. § 9622(d)(2), when Emhart submitted extensive comments on the proposed Consent Decrees. While Emhart argues that the proposed Consent Decrees fail to meet the applicable standards for entry, as established in the

First Circuit (See discussion, infra), for a number of reasons, its primary objection is that the dollar amounts that the United States will receive through the Consent Decrees are too low, and that therefore the Consent Decrees should not be entered and the United States should be forced to reopen negotiations with Brook Village Associates Limited Partnership ("Brook Village") and Centerdale Manor Associates ("Centerdale Manor") to seek a higher dollar amount. However, Emhart's financial analysis of the settlements and the finances of Brook Village and Centerdale Manor is flawed in a number of respects. In addition, none of the other arguments raised by Emhart show that the Consent Decrees do not meet the applicable standards for entry. Therefore, the United States believes that the terms of the Consent Decrees are fair and seeks the Court's entry of the Consent Decrees.

## I. STANDARD FOR JUDICIAL REVIEW

The First Circuit has set forth a judicial review process for CERCLA consent decrees that requires an overall analysis to determine whether the proposed "settlement is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve." United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1990).[1] Further, as the First Circuit found in Cannons, "[t]he relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal . . ." Id. at 84. In conducting a review of a proposed consent decree to determine if it is fair, reasonable, and consistent with the purposes of CERCLA, the First Circuit has also stated "there is deference to the administrative agency's construction of the settlement." Davis, 261 F.3d at 21.

[1] See United States v. Charles George Trucking, Inc., 34 F.3d 1081 (1st Cir. 1994); United States v. Davis, 261 F.3d 1 (1st Cir. 2001).

## II. ARGUMENT

### A. The Consent Decrees Are Procedurally Fair

As the First Circuit has held, the fairness of a CERCLA settlement involves both procedural fairness and substantive fairness. Davis, 261 F.3d at 23; United States v. Cannons, 720 F. Supp. 1027, 1039 (D. Mass. 1989). Emhart argues that the Decrees are procedurally unfair because they were not participants in the settlement discussions between the United States and Brook Village and Centerdale Manor. The question of procedural fairness does not depend on whether every third party with a possible interest had a seat at the negotiating table. The United States is free to conduct separate settlement negotiations with different parties connected to a CERCLA Site. Emhart fails to cite any statute or case that would require the United States to only engage in settlement discussions with all possible parties as a group. As the First Circuit found, "EPA has ample authority to structure its settlement negotiations, including 'broad discretion to structure classes of [Potentially Responsible Parties].'" Davis, 261 F.3d at 23 (citing Cannons, 899 F.2d at 86). Emhart does not argue that the negotiations between the United States and Brook Village and Centerdale Manor were not at arms length, were not in good faith, or that the parties were not represented by experienced counsel. In addition, as required by CERCLA § 122(d)(2), 42 U.S.C. § 9622(d)(2), Emhart was afforded an opportunity to comment on the proposed decrees and took full advantage of this opportunity for involvement in the settlement process. Because the United States did not ultimately adopt Emhart's adverse comments on the proposed Decrees does not mean that Emhart was denied participation in the process of finalizing the proposed Consent Decrees. Since all of these elements were met, the Consent Decrees are procedurally fair.

**B. <u>The Consent Decrees Are Substantively Fair</u>**

In addition to procedural fairness, a Consent Decree needs to be substantively fair, which involves "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." <u>Cannons</u> 899 F.2d at 87. As fully set forth in its Memorandum in support of its Motion to Enter, the United States has already fully explained that a cash out settlement is appropriate and substantively fair for both Brook Village and Centerdale Manor based on the limited ability to pay of these parties and public interest considerations in that the settling parties came to the site after all industrial activity had ceased and are operators of subsidized low-income housing for the elderly.

**1. The Decrees are Fair Based on the Facts Giving Rise to Brook <u>Village's and Centerdale Manor's Liability</u>**

Emhart fails to acknowledge that the nature of Brook Village's and Centerdale Manor's connection to this site is fundamentally different than any other parties' connection to the site. As opposed to Emhart, for example, neither Brook Village or Centerdale Manor contributed any of the hazardous waste to the site. Instead, their liability arises from their situation as owners of property at the site, even though they purchased the property after the hazardous wastes had been released at the site. While Emhart cites to some information indicating that the construction of the buildings owned by Brook Village or Centerdale Manor may have impacted the hazardous waste at the site, Emhart fails to indicate that these alleged activities had any impact on the nature of the response actions that EPA and the Potentially Responsible Parties ("PRPs") have undertaken at the site, or on the costs arising from these response actions. As one of the PRPs that has participated in response actions at the site, Emhart should have been in a position to

quantify any impact that the construction of the buildings had on the response actions or costs at the site, but has not done so.

Even if the construction of the buildings had some impact on the nature of the response actions or the costs related to these actions, the United States is not required to quantify or apportion liability prior to a settlement. As the First Circuit held in Davis, "data on the total extent of harm and the respective liabilities of various PRPs are often unavailable. Such difficulties will not preclude a court from entering a consent decree." 261 F.3d at 24 (citations omitted). See also Charles George Trucking, 34 F.3d at 1088 (Rejecting the need for a precise correlation between the costs paid by a party and its liability at a site given the commonplace lack of complete records).

And finally, the nature of Brook Village's and Centerdale Manor's relationship to the site presents certain litigation risks that were appropriate for the United States to consider in settlement. For example, Brook Village has argued that it is an innocent landowner under CERCLA, negating the liability it would otherwise have as an owner. A settlement always involves some evaluation of the parties' legal positions, as the First Circuit has stated "the reasonableness of a proposed settlement must take into account foreseeable risks of loss." Cannons, 899 F.2d at 90. Emhart's description of the nature of Brook Village's and Centerdale Manor's liability fails to consider the litigation risks that the United States would face in this action.

**2. The Assets or Liabilities of a Third Party Such As NECC Are Irrelevant in Determining Substantive Fairness**

Emhart's arguments that the Court needs to consider the potential liability of, and assets

of, a third party PRP at this site, New England Container Corporation ("NECC"), have no bearing on the substantive fairness of the proposed Consent Decrees before the Court. Emhart speculates that NECC will be unable to reimburse any of the costs incurred by EPA arising from this site, but the precise liability and costs attributable to each party, and each party's ability to pay these costs is not relevant. As discussed above in response to Emhart's argument that a settlement can only be fair if the costs a party is paying exactly match an apportionment of liability for the complete costs at a site. The First Circuit has found the opposite in Davis when it held that, "data on the total extent of harm and the respective liabilities of various PRPs are often unavailable. Such difficulties will not preclude a court from entering a consent decree." 261 F.3d at 24 (citations omitted). Furthermore, when EPA examines a party's ability to pay under its Ability to Pay Policy,[2] whether or not other parties connected to the site have, or do not have, assets does not increase or decrease any one party's ability to pay.

**3. The Total Response Costs Do Not Have to be Determined Prior to Any Settlements**

Emhart claims that a Consent Decree cannot be substantively fair unless the total response costs at a site are known. As a practical matter, the total costs of the cleanup of hazardous wastes cannot be know with certainty until the last dime is spent and the response action is complete. In the meantime, EPA would have to bear the entire costs of the response action unless a PRP was taking the lead on the cleanup. Such a result would be directly at odds with CERCLA's goals. As the First Circuit found in Cannons, "it would disserve a principal end

---

[2] See "General Policy on Superfund Ability to Pay Determinations," Sept. 30, 1997 ("Ability to Pay Policy)"; as amended by "Interim Guidance on the Ability to Pay and De Minimis Revisions to CERCLA § 122(g) by the Small Business Liability Relief and Brownfields Revitalization Act," (May 17, 2004). (Attached as Exhibit 2)

of the statute - achievement of prompt settlement and a concomitant head start on response activities - to leave matters in limbo until more precise information was amassed." 899 F.2d at 88.

#### 4. EPA's Ability to Pay Policy Is Flexible and Does Not Legally Bind the EPA

EPA's Ability to Pay Policy contains flexible terms that can be implemented in different ways given the varied factual scenarios that a prospective settlement may present. The Ability to Pay Policy contains numerous examples of the flexibility that EPA envisioned in issuing the policy. As an example, it states that "normally" an Ability to Pay settlement should require payment of five years of income, but that "The fact pattern associated with [a PRP's] financial position may require deviation . . . ."[3] The Ability to Pay policy clearly states that "Each person's financial condition is unique"[4] and that a settlement can still be considered when "the specifics of the financial position of a PRP are not applicable to the assumptions contained in this guidance."[5]

Many of Emhart's arguments seemingly rely on an assertion that EPA's Ability to Pay Policy is the same as a Statute or Regulation and can be used to determine the fairness or reasonableness of a proposed Consent Decree. However, EPA's Ability to Pay Policy is a guidance document without the legally binding effect that Emhart ascribes to it. It is meant for EPA personnel to use in conducting settlement negotiations under CERCLA and its

---

[3] Ability to Pay Policy at 12.

[4] Id. at 15.

[5] Id.

implementing regulations. On its face the policy is so limited when it states:

> This guidance and any internal procedures adopted for its implementation are intended exclusively as guidance for employees of the U.S. Environmental Protection Agency. This guidance is not a rule and does not create any legal obligations. Whether and how EPA applies the guidance to any particular site will depend on the facts at the site.[6]

The Ability to Pay policy does not mandate a financial analysis from which EPA may not deviate; rather, it provides guidelines and guidance predicated on EPA's 25 years of experience in cleaning up CERCLA sites, and in settling and taking enforcement actions related to those sites. EPA's statements relating to how it intends to exercise its discretionary authority to undertake CERCLA settlements are not intended to, and do not, establish binding requirements. See Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 537 (D.C. Cir. 1986) (agency enforcement policy and guidelines did not establish binding substantive regulation that agency was required to strictly observe). Therefore, the Consent Decrees are substantively fair even where EPA utilizes its flexibility in performing an ability to pay analysis under the Ability to Pay policy.

**5. The Consent Decrees are Substantively Fair Because They Require Brook Village and Centerdale Manor to Pay the Maximum Available While Still Operating as Subsidized Housing**

Emhart undertakes a financial analysis of Brook Village and Centerdale Manor and concludes that Brook Village can pay $2.2 million, instead of $1.4 million, and that Centerdale Manor can pay $4.8 million, instead of $2.3 million. (Stallings Declaration, "Stallings Decl." ¶ 20) (attached to Emhart's Opposition as Exhibit 7). However, the financial analysis of Mr.

[6] "Interim Guidance on the Ability to Pay and De Minimis Revisions to CERCLA § 122(g) by the Small Business Liability Relief and Brownfields Revitalization Act," (May 17, 2004) at 10.

Stallings upon which Emhart relies is flawed because it ignores the plain terms of the Consent Decrees, does not accurately describe Centerdale Manor's or Brook Village's financial situation, and more fundamentally, fails to analyze appropriately the terms of the refinancings with Rhode Island Housing in order to see if any more funds are available.

**a. Emhart's Financial Analysis Ignores the Terms of the Consent Decrees**

The Consent Decree is premised on Brook Village and Centerdale Manor paying the United States by refinancing their properties and taking on more debt. The mortgages are being refinanced by Rhode Island Housing and therefore must follow the underwriting model used by Rhode Island Housing. The Consent Decrees contain numerous provisions that provide that the final settlement amount will be adjusted once the mortgage refinancings are concluded.

Emhart argues that both Brook Village and Centerdale Manor could pay an additional $300,000 if Rhode Island Housing were to use a lower interest rate in the refinancings. Emhart's Opposition p. 22. However, the Consent Decrees themselves, in Section VI, ¶5, state that the payment amount in the refinancings shall "[use] the Prevailing Interest Rate in effect at the time of closing" determined according to an express formula set forth in Section IV, ¶3(q) of the Consent Decrees, defining "Prevailing Interest Rate." See Rebuttal Declaration of Joan Meyer, "Meyer Rebuttal Decl." ¶3. (attached hereto as Exhibit 1). Therefore Emhart's purported underpayment is illusory as the Decrees will automatically update the payment amount based on the prevailing interest rate. In substituting his own interest rate, Emhart's declarant Mr. Stallings again ignores the Consent Decrees' definition of the "Prevailing Interest Rate" and assumes a lower interest rate based on a brief and general email exchange with Rhode Island Housing in

which he did not disclose the identities of the properties that would be subject to refinancing. See Meyer Rebuttal Decl. ¶4, 8.

Emhart's declarant Mr. Stallings also finds approximately $300,000 from Centerdale Manor in its Replacement Reserves and Operating Reserves. These reserves are funds that Rhode Island Housing requires mortgagees to set aside to account for unexpected financial needs. See Meyer Rebuttal Decl. ¶5. However, to the extent that Centerdale Manor's, or even Brook Village's Replacement or Operating Reserves exceed the maximum required by Rhode Island Housing, the Consent Decrees, in Section VI, ¶5, already require that the excess be paid to the United States as the "maximum equity available from the Preservation Refinancing mortgage transaction . . ." will be paid.

Mr. Stalling again fails to recognize that the Consent Decree does not require the payment of a fixed amount as he finds that Centerdale Manor's payoff of a mortgage loan of approximately one million dollars indicates that this is an additional amount of funds that can be paid to the United States. See Stallings Decl. ¶12, and Meyer Rebuttal Decl. ¶6. As with the other items described above, the Consent Decrees, in Section VI, ¶5, will require that any excess be paid to the United States as the "maximum equity available from the Preservation Refinancing mortgage transaction . . ." will be paid.

Finally, Emhart's declarant Mr. Stallings believes that Brook Village will have in hand approximately $300,000 in insurance receivables that could be used as payment to the United States. See Stallings Decl. ¶13, and Meyer Rebuttal Decl. ¶9. However, as with a large part of his analysis, he ignores the specific terms of the Consent Decree, which already require payment of the majority of this amount. Pursuant to the Brook Village Consent Decree, at ¶¶ 11 and 12,

the United States will "receive 75 percent of the indemnity portion of any insurance recoveries" minus fees. Therefore Mr. Stallings again discovers a "new" source of funds that was actually previously discussed between the parties and specifically dealt with in the Consent Decree.

Emhart's reliance on Mr. Stalling's financial analysis, which failed to examine and factor in the effects of the specific terms of the Consent Decree, contribute approximately $1.6 million dollars to the additional amount that it believes Centerdale Manor should pay, and contributes approximately $600,000 to the additional amount that it believes Brook Village should pay. In its initial financial analysis the United States, as well as Centerdale Manor and Brook Village, were aware of these items, and therefore drafted terms into the Consent Decrees that govern how these items would factor into the eventual payment to the United States. The operation of the specific language and terms of the Consent Decrees at the time of the conclusion of the Preservation Refinancing and resolution of insurance claims shows that the Decrees are substantively fair.

**b. Emhart's Financial Analysis Does Not <u>Accurately Represent the Parties' Finances</u>**

Emhart's financial analysis relies on numerous purported "new" sources of funds for Centerdale Manor and Brook Village. In addition to the "new" funds which the terms of the Consent Decrees will capture, Emhart also relies on additional line items that are not actually available as funds for the settlement. Mr. Stallings finds new funds in the amount of approximately $300,000 appearing as "surplus funds" in a 2004 Brook Village Department of Housing and Urban Development form. <u>See</u> Stallings Decl. ¶13, and Meyer Rebuttal Decl. ¶10. However, this line item does not reflect an asset reserve, as indicated on Brook Village's 2004

balance sheet where its current assets of $661,504 were exceeded by its liabilities of $1,273,941. See Meyer Rebuttal Decl. ¶10.

In Emhart's financial analysis of Centerdale Manor, Mr. Stallings assumed that a one-time payment of $501,806 in environmental expenses in 2003 could be converted to an annual cash amount that could be used in the settlement. See Stallings Decl. ¶6, and Meyer Rebuttal Decl. ¶12. However, this was a one time payment that Centerdale Manor had to make by drawing from the operating reserves that Rhode Island Housing required it to maintain at a certain level. Such a one time payment from its emergency funds cannot properly be assumed to recur every year thereafter. See Meyer Rebuttal Decl. ¶12. Similarly, Brook Village had to meet legal and professional fees by drawing on its required reserves, a one time source of funds that Mr. Stallings assumes could continue. See Meyer Rebuttal Decl. ¶12. In addition, Mr. Stallings raises a question about $145,000 in Centerdale Manor's costs. See Stallings Decl. ¶10. However this line item is described in the Rhode Island Housing underwriting model and consists of items such as survey, appraisal, title, and recording costs. See Meyer Rebuttal Decl. ¶12.

**c. Emhart's Financial Analysis Ignores the Future Funds Available to the Parties**

Emhart's analysis does not focus or analyze the amount of future cash flow available to Centerdale Manor and Brook Village in the future. Instead, Mr. Stallings examined a number of historic revenue and expense items, and then turned these into a prediction of the funds that would be available to the parties in the future. See Meyer Rebuttal Decl. ¶11. However, Emhart's analysis ignores fundamental features of predicting future cash flow available to the

parties.

First, Mr. Stallings has assumed that the parties could use every last cent of their past cash flows for every year going forward. See Meyer Rebuttal Decl. ¶14. Such an approach would force Centerdale Manor and Brook Village to operate on the very edge of bankruptcy. Therefore, without specifically stating so in its Opposition, Emhart's suggested approach comes very close to forcing Centerdale Manor and Brook Village to change their operations from subsidized housing to market based housing in order to meet future obligations as it is highly unlikely that any business can meet its past performance in every year going forward into the future. Assuming that Centerdale Manor and Brook Village can use one hundred percent of the amount of the cash flow that they had over the past years in every future year ignores the increases that any business faces in rising operating costs. See Meyer Rebuttal Decl. ¶12. EPA's own Ability to Pay guidance follows this common financial practice when it suggests that a party's ability to pay amount should "be reduced by an appropriate safety factor to reflect the uncertainties in making predictions . . . ."[7]

Second, Mr. Stallings' approach does not factor in any capital rehabilitation costs for the properties, costs that are large, $1.3 million for Centerdale Manor and $873,000 for Brook Village. While Emhart argues that these rehabilitation costs are not justified, it is impossible to continue to run a housing project, or any structure, without the need for periodic significant repairs and maintenance. Because these rehabilitation costs are necessary to allow the properties to continue to be used as housing, they are included in Rhode Island Housing's underwriting models for the refinancing. See Meyer Rebuttal Decl. ¶12.

---

[7] Ability to Pay Policy at 13.

various claims against Centerdale Manor and Brook Village, including claims for cost recovery under CERCLA § 107, 42 U.S.C. § 9607. The State has incurred, and is likely to continue to incur, costs in connection with this site and therefore the payment of settlement amounts to resolve the settling defendants' liabilities are justified and substantively fair under the terms of CERCLA.

As with their financial analysis, Emhart ignores the clear terms of the Consent Decrees when it claims that the uses of the Escrow Accounts set up with $150,000 from each of the settlement amounts are not identified. Instead, the Consent Decrees state that these amounts are to be used to complete performance of three "Removal Orders", a term specifically defined by each Decree at Section IV, ¶3(t), and, moreover, the Consent Decrees require that any funds remaining in the Escrow Accounts following completion of the Removal Orders be paid to EPA, Consent Decrees, Section VI, ¶10.

**7. The United States is Not Required to Pursue all Partners in a Partnership in Order to Satisfy the Substantive Fairness <u>Element for Entry of a Consent Decree</u>**

Emhart claims that the Consent Decrees are not substantively fair because they do not require any of the general partners of Brook Village or Centerdale Manor to contribute directly to the settlement amounts. However, Emhart's sole citation for a "requirement" that purports to require the United States to make a CERCLA cost recovery claim against all general partners is EPA's own Ability to Pay guidance. As discussed more fully above, the Ability to Pay guidance contains a great deal of flexibility in its suggested approach to settlements, noting that each "fact pattern associated with [a PRP's] financial position may require deviation . . . ."[8] and that a

[8] Ability to Pay Policy at 12.

settlement can still be considered when "[t]he specifics of the financial position of a PRP are not applicable to the assumptions contained in this guidance . . . ."[9] Also as discussed above, the Ability to Pay guidance is not a document that legally restricts EPA's ability to settle cases.

The United States is afforded broad discretion in the enforcement of federal statutes. See Wayte v. United States, 470 U.S. 598, 607 (1985) (it is well-settled that agencies have broad discretion in determining when and how to enforce statutory requirements); Heckler v. Chaney, 470 U.S. 821, 831 (1985) (decision not to prosecute or enforce is generally committed to an agency's "absolute discretion"). This discretion has been exercised in this case and Emhart cites to no precedent that would require the United States to name and pursue every party with a connection, no matter how tenuous, to a CERCLA hazardous waste site. Therefore, because the United States' decision to not pursue the general partners is consistent with the flexibility afforded by EPA's Ability to Pay guidance, and within the discretion of the United States, it does not adversely affect the substantive fairness of the Consent Decrees before the Court.

## C. The Consent Decrees Are Reasonable

The Consent Decrees provide a reasonable monetary recovery in light of the settling defendants' involvement with the site and their current financial situations. The voluntary refinancing that Brook Village and Centerdale Manor are undertaking will ensure that over $3 million in funds will be put into a special account for this site, allowing EPA to continue hazardous waste clean up response activities at the site.

---

[9] Id. at 15

**D. The Consent Decrees Are Consistent with CERCLA's Goals and Are in the Public Interest**

The Consent Decrees ensure that EPA will recover over $3 million for use for future clean up work at this site, instead of having to bear the risks of continued litigation and the risks that Brook Village's or Centerdale Manor's financial situation will worsen during an effort to attain any other amount. The prompt settlement of the United States cases against Brook Village and Centerdale Manor, without endless litigation, and the concomitant recovery of costs that EPA has expended, allow EPA to ensure that hazardous waste sites are cleaned up in a timely manner, complying with the goals of CERCLA. See S. Rep. No. 96-848, at 13 (1980); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986).

## CONCLUSION

The United States, both in its United States Motion to Enter Consent Decrees filed February 9, 2006 and in this Reply to Emhart's Opposition, has demonstrated that the settlements with Brook Village and Centerdale Manor are fair, reasonable and in the public interest and should be approved by this Court.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

JEROME W. MACLAUGHLIN
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

ROBERT CLARK CORRENTE
United States Attorney

By: ______________________
LUIS MATOS (R.I. Bar No. 4475)
Assistant United States Attorney
District of Rhode Island
Fleet Center, 50 Kennedy Plaza, 8th Floor,
Providence, Rhode Island 02903
(401) 709-5000

OF COUNSEL:

EVE VAUDO
Enforcement Counsel
U.S. Environmental Protection Agency
New England Region
One Congress St., Suite 1100
Boston, Ma. 02114-2023

CERTIFICATE OF SERVICE

I, Jerome W. MacLaughlin, hereby certify that copies of the United States' Reply to Intervenor Emhart Industries', Inc. ("Emhart") Opposition to the United States Motion to Enter Consent Decrees, were served on June 28th, 2006 by first class mail, postage prepaid, and by electronic mail, as follows:

Laurie Burt, Esq.
Foley Hoag
Seaport World Trade Center
155 Seaport Blvd.
Boston, Ma. 02210-2600
lburt@foleyhoag.com

Richard J. Welch
Moses & Afonso
170 Westminster Street, Suite 201
Providence, R.I. 02903
rwelch@mosesafonso.com

William S. Eggeling
Ropes & Gray LLP
30 Kennedy Plaza
Providence, R.I. 02903
William.Eggeling@ropesgray.com

Howard J. Castleman, Esq.
Holland & Knight LLP
10 St. James Avenue
11th Floor
Boston, MA 02116
howard.castleman@hklaw.com

Michael Milito, Esq.
Rhode Island Housing and Mortgage Finance Corp.
44 Washington St.
Providence, RI. 02903
mmilito@rihousing.com

Brian Wagner, Esq.
Rhode Island Department of Environmental Management
235 Promenade Street
Providence, RI. 02908-5767
brian.wagner@dem.ri.gov

Terrence Tierney
Assistant Attorney General
R.I. Department of the Attorney General
150 North Main St.
Providence, R.I. 02903
Ttierney@riag.ri.gov

Jerome C. Muys, Jr.
Swidler Berlin
The Washington Harbour
3000 K. Street, N.W., Suite 300
Washington, D.C. 20007-5116
jcmuys@swidlaw.com

Craig Scott
Duffy Sweeny & Scott, Ltd.
One Turks Head Place, Suite 1200
Providence, RI 02903
cscott@duffysweeney.com

James P. Ray
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
jray@rc.com

[signature]

Jerome W. MacLaughlin
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611