**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 05-195S |
| | ) | |
| v. | ) | |
| | ) | |
| BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP and | ) | |
| | ) | |
| CENTERDALE MANOR ASSOCIATES LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Defendants | ) | |

**REBUTTAL DECLARATION OF JOAN K. MEYER**

1. I am a Principal with Industrial Economics, Incorporated (IEc), an economics and policy consulting firm located at 2067 Massachusetts Avenue, Cambridge, Massachusetts 02140. The U.S. Environmental Protection Agency ("EPA") retained me to assess the ability of Centerdale Manor Associates and Brook Village Associates to pay for the response costs and other remediation expenses associated with the Centredale Manor Restoration Project Superfund Site while continuing to operate as they have in the past as federally subsidized elderly housing developments. I previously summarized my opinions in a Declaration dated January 17, 2006.

2. An accountant retained by Emhart Industries, Inc., Wesley M. Stallings, filed a Declaration on June 14, 20006 in which he reviewed my findings and concluded that the estimated proceeds available for contribution to EPA from the proposed refinancing of the Centerdale Manor and Brook Village housing developments by Rhode Island Housing should be higher.

Specifically, Mr. Stallings concluded that Centerdale Manor "... should probably be contributing at least $4,838,655 from its refinancing toward costs at the Site instead of $2,311,364, and Brook Village should probably be contributing $2,284,055 from its refinancing instead of $1,451,936." (Stallings Declaration, ¶ 20, p. 9). Stalling's higher estimates, however, are based entirely on interest rate and other adjustments that are already accounted for in the Consent Decrees in addition to a misunderstanding of certain categories of expenses related to the loan financing and revenue sources. In addition, Mr. Stallings misconstrued the analysis I presented in my declaration.

3. Mr. Stallings purportedly "updates" my analysis, in part, by recalculating the mortgages to be refinanced by Rhode Island Housing using lower interest rates. (See Stallings Declaration, ¶8, p. 4) **Exhibits 1** and **2** (line 3) both show the increase Mr. Stallings calculates will be available from a more updated estimate he uses to project the interest rate that will be used at the closing of the refinancing extended by Rhode Island Housing. However, the Consent Decrees negotiated with Centerdale Manor and Brook Village contain provisions that will adjust the final amounts to be paid to EPA based on the interest rates prevailing at the time of loan closings.[1] Hence, the additional source of funds which Mr. Stallings claims will be available from refinancing the mortgages held by Centerdale Manor and Brook Village through use of a lower interest rate is illusory. The Consent Decrees <u>already</u> specify this adjustment.

4. In addition, I question the interest rates used by Mr. Stallings (7.9% taxable and 6.85% tax exempt). His source for these rates was a series of exchanges via electronic mail with a staff

---

[1] Specifically, both Consent Decrees state in Section VI "If the Effective Date of this Consent Decree is more than six months after Settling Defendant signs this Consent Decree, then the total settlement amount of ... and the settlement payments set forth in (b) and (c) of this Paragraph shall be adjusted, as necessary to reflect the <u>maximum equity</u> available from the Preservation Refinancing mortgage transaction, consistent with federal and state requirements, <u>using the Prevailing Interest Rate in effect at the time of the closing</u>." [emphasis added] Consent Decree, United States and the State of Rhode Island v. Centerdale Manor Associates, p. 7 and Consent Decree, United States and the State of Rhode Island v. Brook Village Associates Limited Partnership, p. 7. Since more than six months has elapsed since the Consent Decrees were signed in January 2005, this provision is operative.

member of the Rhode Island Housing and Mortgage Finance Corporation (RIHMFC) in which he failed both to identify the projects for which these rates were intended and to describe his role in the current proceeding. (Stallings Declaration, Exhibit D) However, the Consent Decrees signed in January 2005 provide an explicit formula for the prevailing interest rate to be used at the date of closing of the proposed refinancings. This formula adds 365 basis points (i.e., 3.65 percent) to the most recent weekly average yield on the 20-year constant maturity Treasury Bond relative to the closing date of the mortgage refinancing.[2] Any change between the time of the initial estimates and the final closing of the refinancing is already provided for in the Consent Decrees. Indeed, with the recent interest rate increases, further delay in approval of the Consent Decrees may serve to make less, not more, funding available for contribution to EPA than is estimated by Mr. Stallings.

5. With respect to Centerdale Manor, Mr. Stallings additionally asserts that the sources of funds available from Replacement Reserves and Operating Reserves, as shown in **Exhibit 1** on line 4, should be adjusted upward to account for higher values shown in Centerdale Manor's most recent financial statements. (Stallings Declaration, ¶9, pages 4-5) The Replacement Reserve is a required amount set aside for repairs and replacements and is fixed, by regulatory requirements, to equal 3 percent of the gross rents of the development.[3] Similarly, the Operating Reserve represents an amount set aside as a contingency fund in the event that a shortfall between actual and expected operating expenses develops. As I understand, Rhode Island Housing typically seeks an operating reserve equal to six months of average monthly operating expenses. While Mr. Stallings is correct in that the amount accumulated in the Replacement and Operating Reserves varies, he again overlooked the fact that the Consent Decrees already make provisions to adjust the final amount of the proceeds available for

---

[2] See the Consent Decree, United States and the State of Rhode Island v. Centerdale Manor Associates, paragraph 3q, p. 6 and Consent Decree, United States and the State of Rhode Island v. Brook Village Associates Limited Partnership, paragraph 3q, p. 6, for the definition of "Prevailing Interest Rate."

[3] For a more complete description, see for example, Centerdale Manor Associates, Audited Financial Statements, year ended February 28, 2003, Note 4, page 9.

disbursement to EPA for differences in the value of these reserves at the time of the refinancing and the estimate made within Rhode Island Housing's underwriting model. Both Consent Decrees require the total settlement amount to be adjusted to reflect the maximum equity available at the time of the actual refinancing transaction.[4] This adjustment includes any changes to the replacement and operating reserves.

6. In addition to the interest rate and operating/replacement reserve adjustments, already accounted for in the Consent Decree negotiated with Centerdale Manor, Mr. Stallings additionally concludes that three of the expense categories related to the Centerdale Manor loan refinancing should also be "updated" and, therefore, excluded from the uses of the refinancing proceeds to be paid before the remainder is released to EPA. The first of these expense categories is the "First Mortgage Payoff" of $1,080,364 (as shown in **Exhibit 1**, line 6). Mr Stallings observes that it has been repaid since the estimates were generated in the November 5, 2004 underwriting model on which the Consent Decree with Centerdale Manor was based and, thus, constitutes additional funding available to be paid to EPA. (Stallings Declaration, ¶12, page 6). However, the Consent Decree negotiated with Centerdale Manor already addresses this contingency. Consistent with standard lending practices, the Consent Decree recognizes that adjustments will be made to account for changes in necessary payments, which include repayment of prior mortgages.[5] The extent to which the First Mortgage as been repaid in whole or in part will be fully reflected in the amount to be paid to EPA as a result of the refinancing at the time of closing.

7. The two other expense categories related to Centerdale Manor identified by Mr. Stallings are "Outstanding legal costs" estimated to be $728,921 and "Future legal costs related to EPA

---

[4] Consent Decree, United States and the State of Rhode Island v. Centerdale Manor Associates, p. 7 and Consent Decree, United States and the State of Rhode Island v. Brook Village Associates Limited Partnership, p. 7.

[5] Consent Decree, United States and the State of Rhode Island v. Centerdale Manor Associates, p. 7, section VI, specifies that the total settlement amount and settlement payments will be adjusted, as necessary, to reflect the maximum equity available from the mortgage transaction.

liability" estimated to be $187,449 (i.e., **Exhibit 1**, lines 11 and 12). In Mr. Stallings recalculations, neither expense should be paid with proceeds from the refinancing. (Stallings Declaration, ¶10, p. 5) He posits that any legal costs being paid to EPA should be included in the settlement amount and that any future legal costs will be rendered irrelevant by the Consent Decree or can be paid from operating reserves. However, as my initial discussions with the Rhode Island Housing officials revealed, Centerdale Manor's outstanding legal costs of $728,921 represent costs incurred by Centerdale Manor associated with the environmental liability and not reimbursement to EPA for the Agency's legal costs. In addition, the "future legal costs related to EPA liability" of $187,449 represented the estimate of the likely future additional legal costs Centerdale Manor would incur between the date of the pro forma model (i.e., November 5, 2004) and the final consummation of the Consent Decree. As shown in the Rhode Island Housing pro forma model, these costs are considered transaction costs and regarded as standard fees associated with the refinancing.

8. With respect to Brook Village, Mr. Stallings, again, points to additional sources of funds that he claims should be available through use of a lower interest rate. **Exhibit 2** provides a comparison of the funds estimated by Rhode Island Housing to be available as a contribution to EPA with Mr. Stallings' estimate. As with Centerdale Manor, any differences between the mortgage rate for the refinanced loan estimated at the time of Rhode Island Housing's pro forma analysis of July 6, 2004 and the actual refinancing (as shown in **Exhibit 2** line 3) is already accounted for in the Consent Decree.[6]

9. Also with respect to Brook Village, Mr. Stallings asserts two sources of cash were excluded from the July 6, 2004 analysis; namely, $298,490 in insurance receivables and $296,219 in

---

[6] Specifically, both Consent Decrees state in Section VI that if more than six months elapses between the time the Consent Decrees were signed (i.e., January 2005) and the closing date of the refinancings, then the interest rate will be adjusted to the "Prevailing Interest Rate" in effect at the time of the closing. Consent Decree, United States and the State of Rhode Island v. Centerdale Manor Associates, p. 7 and Consent Decree, United States and the State of Rhode Island v. Brook Village Associates Limited Partnership, p. 7.

surplus cash from HUD that he detected through his review of the Brook Village financial statements for the year ended December 31, 2004. (Stallings Declaration, ¶13, pp. 6-7) Mr. Stallings is correct that the $298,490 in possible insurance receivables is identified as a potential future source of revenues. However, the Consent Decree negotiated with Brook Village specifically stipulates that any recovery of these insurance proceeds will be shared with the federal government.[7] Thus, this purported revenue source identified by Mr. Stallings already is accounted for in the Consent Decree with Brook Village and the ultimate contribution made by Brook Village to EPA will be adjusted upwards for any recovery of these insurance proceeds.

10. The second source of surplus cash that Mr. Stallings asserts is available to Brook Village comes from U.S. Department of Housing and Urban Development (HUD) Form 93486 included at the end of Brook Village's 2004 audited financial statements. This form reflects $315,592 in cash accounts and $78,865 in certain current obligations as of December 31, 2004, the difference of which amounts to $296,219. As I understand, this HUD form is used to evaluate whether funds hypothetically are available under certain HUD criteria to pay owners of HUD-assisted properties a 6 percent limited dividend.[8] The computation of "surplus cash" in part A of the HUD form does not reflect an asset reserve. The HUD form, moreover, does not present the complete picture of Brook Village's financial condition nor is it intended to do so. The Brook Village 2004 balance sheet shows total current assets of $661,504 and total current liabilities of $1,273,941, reflecting significant cash demands for Brook Village on a current basis.

11. Instead of identifying isolated revenue or expense items, it would have been more appropriate for Mr. Stallings to have undertaken a careful projection of the future cash flows

---

[7] Consent Decree, United States and the State of Rhode Island v. Brook Village Associates Limited Partnership, p .9, paragraphs 11 and 12.

[8] See, for example, "Consolidated Audit Guide for Audits of HUD Programs," Handbook 2000.04 REV-2 CHG-1, December 2001.

of Centerdale Manor and Brook Village. Alternatively, I would have expected him to focus on the underwriting models developed by Rhode Island Housing, as I did, which project future cash flows expected to be earned by Centerdale Manor and Brook Village in order to calculate the value of the 30-year mortgages the two developments can support. This analysis of future cash flows of the two housing developments is absolutely fundamental because the mortgages essentially convert 30 years worth of the estimated net cash flow each development reasonably can be expected to generate and dedicate towards loan payments into lump sums from which the contributions to EPA can be made. Mr. Stallings' focus on a few select historic revenue and expense items fails to answer the bigger question of how large of a loan each development can likely support in the refinancing arrangement offered by Rhode Island Housing.

12. Mr. Stallings also raises a number of objections to my analysis that apparently do not relate directly to the contribution amount available from the refinancing. In my analysis, I examined Centerdale Manor's and Brook Village's recent history of generating net income and cash flow as a first step in assessing whether, in the absence of refinancing, the two developments likely will generate cash flow that could be dedicated ultimately to fund larger contributions to EPA than the proposed refinancing by Rhode Island Housing. Instead of making a similar comparison, Mr. Stallings, again, singles out isolated expense and revenue items. For example, he points to my review of Centerdale Manor's recent income statements and statements of cash flow to assess whether it had undertaken any significant discretionary costs or expenses. Mr. Stallings appears to believe that the $501,806 in environmental expenses incurred by Centerdale Manor in fiscal year ("FY") 2003 was discretionary or, if not incurred, would have generated $501,806 in income that would have been available but for the environmental liability. (Stallings Declaration, ¶6, pp. 2-3) A review of the statement of cash flows, however, would have shown that the large negative cash outflows associated with operations and financing of Centerdale Manor, including the large environmental expense, were offset mainly by draining down the "residual receipts escrow" by $561,548. As I understand, doing so required Centerdale Manor to obtain explicit

authorization from Rhode Island Housing. Had Centerdale Manor not faced the high, non-discretionary environmental expenses that it did in FY 2003, it would not have been allowed to drain this escrow account. Draining this escrow account was a one-time source of funds. Thus, while the environmental expense of $501,806 incurred in FY 2003 was a one-time expense, the source of funds used to pay for it was a one-time source. Similarly, Mr. Stallings observes the relatively high legal and professional fees incurred by Brook Village, assumes that they are entirely related to the environmental liability under negotiation with EPA, and, hence, will not occur in the future. Again, examination of the statements of cash flows would have shown that disbursements from the residual receipts fund and proceeds from short term loans appear to have been used to offset the legal and professional fees incurred.[9] Relying on a review of the income statement, alone, as Mr. Stallings appears to have done, leads to misleading conclusions.

13. Mr. Stallings additionally questions whether a cost item for Centerdale Manor listed as "Misc." of $145,000 is justifiable because he is unable to determine the nature of this cost. (Stallings Declaration, ¶10, page 5) The underwriting model developed by Rhode Island Housing (November 5, 2004), however, shows that this cost consists of miscellaneous items such as survey costs, environmental survey costs, cost certification, structural engineering, property appraisal, and title and recording costs.[10] The constituents of this cost category are fully disclosed in the model.

14. Perhaps more serious than pointing out isolated expense items, however, is the implication Mr. Stallings appears to draw from them. Namely, that without these expense items, Centerdale Manor and Brook Village would enjoy an annual average "net cash flow" of $733,356 and $425,801, respectively, before debt service. (Stallings Declaration, ¶ 6 and 7,

---

[9] Note that the legal and professional fees will continue to mount if the Consent Decrees are not finalized and litigation associated with the Superfund liability continues.

[10] The items making up the "Misc" category are identified on the worksheet entitled "Development/Rehabilitation Costs (USES)," Rhode Island Housing Underwriting Model, *Project: Centerdale Manor, City: North Providence*, November 5, 2004.

p. 3) Even if, for argument's sake, the expense items identified by Stallings should be properly excluded, he fails to properly conduct a net cash flow analysis such as the cash flow analyses that are incorporated in the underwriting models developed by Rhode Island Housing. By not doing so, he commits at least two fundamental errors. First, even if an entity generated positive annual net cash flow in the recent past and its past performance is a sound predictor of its future performance, to presume the entity could pay out the <u>entire</u> amount that it has earned on average in the recent past is nearly always unreasonable. Any unexpected expense or drop in revenues in the future would lead to a cash shortfall in a given year if the entity's mortgage payments take up all of its annual average net income. In turn, this could quickly spiral into serious financial hardship or even bankruptcy for the entity. For this reason, lenders and financial analysts nearly always require that borrowers demonstrate that their future cash revenues will exceed all of their expected cash outflows, including prospective loan payments, by a given target percentage.[11] This "cash cushion" guards against sudden insolvency if the borrower's costs increase faster than expected. Centerdale Manor and Brook Village both appear to have experienced double-digit increases in the cost of utilities, insurance, and taxes in recent years. (Meyer Declaration, January 17, 2006, Tables B-1 and D-1) Second, although Mr. Stallings presents an <u>estimated</u> cash flow by adjusting net income by a number of factors, he failed to compute true cash flow. (Stallings Declaration, Exhibits A and C) His approach ignores the large rehabilitation costs that Centerdale Manor and Brook Village face of $1,335,000 and $873,000, respectively, not to mention other costs and expense items that appear to be trending upward. Why he failed to do so is a mystery when both the underwriting models developed by Rhode Island Housing or even the statements of cash flow from the audited financial statements for Centerdale Manor and Brook Village are available. This mystery is further compounded by his discussion of the net cash flow figures for Centerdale Manor and Brook Village since he does not employ these incorrectly calculated figures in any other computations.

---

[11] Inspection of the underwriting models used by Rhode Island Housing shows that it requires a debt service coverage ratio of 1.2 meaning that the projected net cash flow of the borrower must exceed the loan payments owed by at least 20 percent. In addition, Rhode Island Housing requires its program participants to set aside prescribed contingency funds for operating and replacement costs.

15. In sum, Mr. Stallings concludes that additional contributions by Centerdale Manor and Brook Village should be made from the proposed refinancing by Rhode Island Housing. But the adjustments made by Mr. Stallings in arriving at his higher figures are adjustments already prescribed in the Consent Decrees or are based on a misunderstanding of certain expense and revenue categories.

I declare under penalty of perjury that the foregoing is true and correct.

June 22, 2006
Date

Joan K. Meyer
Joan K. Meyer