UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,
Plaintiff,

v.                                                    C.A. No. 05-195

BROOK VILLAGE ASSOCIATES,
LIMITED PARTNERSHIP and
CENTERDALE MANOR ASSOCIATES,
Defendants.

## MEMORANDUM AND ORDER

This matter is before the Court on a motion filed by the United States to enter two

consent decrees, one between the United States and Defendant Brook Village Associates,

Limited Partnership ("Brook Village"), and the other between the United States and Defendant

Centerdale Manor Associates ("Centerdale Manor").[1]  The proposed consent decrees would

resolve the United States' claims against the Defendants arising under Sections 106 and 107 of

the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42

U.S.C. §§ 9601-9675.  Intervenor Emhart Industries, Inc. ("Emhart") opposes the motion.  For

the reasons set forth below, the United States' motion is granted.

### I. Standard of Review

CERCLA requires that a proposed consent decree be entered in the appropriate United

States District Court.  42 U.S.C. § 9622(d)(1)(A).  The approval process, however, is more than a

mere formality.  See United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990).

---

[1] The State of Rhode Island joins the United States as a party to the consent decrees.

"[T]he Court does not serve simply as a rubber stamp that automatically places its imprimatur on the proposed settlement. Rather, the Court must make an independent judgment as to whether the proposed settlement is fair and reasonable." United States v. Davis, 11 F. Supp. 2d 183, 189 (D.R.I. 1998), aff'd, 261 F.3d 1 (1st Cir. 2001).

This does not mean that the Court should substitute its judgment for the agreement of the parties or the expertise of the Environmental Protection Agency ("EPA"). See United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1085 (1st Cir. 1994). The Court must give some deference to the agency's determination that the settlement is appropriate. See Cannons, 899 F.2d at 84. "That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance." Id. The relevant standard, after all, is not whether the settlement is one which the Court itself might have fashioned, or considers as ideal, but whether the proposed decree is (1) fair, (2) reasonable, and (3) consistent with the purposes that CERCLA is intended to serve. Id. at 84-85. "The United States is obliged to proffer sufficient facts and reasons to establish that these factors have been satisfied and that approval is warranted." Davis, 11 F. Supp. 2d at 189.

## II. Background

The essential facts are not in dispute. The United States and the State of Rhode Island seek to recover costs that have been or will be incurred in connection with the cleanup of hazardous substances at or from the Centredale Manor Restoration Project Superfund Site ("the Site"). The Site encompasses approximately nine acres located on the eastern bank of the

2

Woonasquatucket River in North Providence, Rhode Island. In 1996, EPA discovered hazardous

substances in samples taken from the soil, wetlands, and flood plain at the Site, including

polychlorinated biphenyls, mercury, antimony, arsenic, chromium, lead, manganese, and dioxin.

A chemical manufacturer began operating on a portion of the Site in approximately 1940,

but ceased operations in the early 1970s. EPA believes Emhart to be a successor to this chemical

company. New England Container Company ("NECC") operated a drum reconditioning facility

on another portion of the Site from approximately 1952 to 1971.[2] A fire in the early 1970s,

however, destroyed most of the structures at the Site. In 1976, Brook Village purchased that

portion of the Site on which the chemical company had previously operated, and completed

construction of an apartment building in 1977. Centerdale Manor purchased that portion of the

Site on which NECC had previously operated. In 1983, Centerdale Manor completed

construction of its own apartment building.

Both Brook Village and Centerdale Manor provide affordable housing for elderly Rhode

Island residents through the Section 8 federal housing program, established under the Housing

and Community Development Act of 1974, 42 U.S.C. §§ 5301-5321. Since 1977, Brook Village

has provided, and continues to provide, affordable housing for more than 100 elderly residents.

Centerdale Manor provides affordable housing to approximately 130 elderly residents, and has

done so since 1983. The Rhode Island Housing and Mortgage Finance Corporation ("Rhode

---

[2] Emhart alleges that NECC is virtually insolvent. According to Emhart, in July 2004, substantially all of NECC's assets were sold to American Container Net, Inc. for $4.3 million. Subsequently, NECC's parent corporation, Russell-Stanley, entered into bankruptcy and sold nearly all of its assets to a German entity. NECC was excluded from the bankruptcy, but Emhart asserts that through a series of inter-corporate transactions, NECC was left with only $2.5 million in assets. Emhart argues that NECC's current assets fall far short of its potential liability under CERCLA (both for its alleged activities here and at a site in New Jersey).

Island Housing") is responsible for administering the loans under the Section 8 program in Rhode Island, and closely monitors the physical and financial condition of both Brook Village and Centerdale Manor.

On April 12, 2000, EPA issued a Unilateral Administrative Order ("UAO") to five Potentially Responsible Parties ("PRPs"), including Brook Village, Centerdale Manor, Emhart, and NECC, requesting that all five PRPs voluntarily perform or finance preliminary cleanup activities at the Site. These activities included installation of a second interim soil cap and implementation of certain flood control measures. All five PRPs complied with the UAO, and EPA approved the completion of the initial cleanup on September 11, 2000. In March 2001, the Site was placed on the National Priorities List ("NPL"), 40 C.F.R. Part 300, Appendix B, pursuant to Section 105(a) of CERCLA, 42 U.S.C. § 9605(a). Sites on the NPL are those that EPA has determined present the greatest danger to public health, welfare, or the environment, and are eligible for long-term remedial action financed with funds from the Hazardous Substance Superfund, commonly referred to as the "Superfund." See 42 U.S.C. § 9611.

On March 26, 2001, EPA issued a second UAO to Brook Village, Centerdale Manor, Emhart, NECC, and one other PRP, to perform additional removal activities at the Site, including the removal of contaminated soil and sediments from Allendale Pond and the restoration of the Allendale Dam. Again, all five PRPs complied with the UAO. In September 2003, EPA issued an Administrative Order on Consent ("AOC") requiring Brook Village, Centerdale Manor, Emhart, NECC, and six other PRPs to perform further cleanup activities at the Site. Brook Village, Centerdale Manor, Emhart, and NECC all complied with the AOC. Brook Village and Centerdale Manor informed EPA that they have each spent more than one million dollars in

contractor, consultant, and attorneys' fees in responding to the contamination at the site.[3]

On May 6, 2005, the United States filed a complaint against Brook Village and Centerdale Manor, pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607. The United States also filed notice of its intent to lodge two consent decrees with this Court in accordance with 28 C.F.R. § 50.7.[4] On February 9, 2006, the United States filed a motion to enter two consent decrees pursuant to Section 122(d)(1)(A) of CERCLA, 42 U.S.C. § 9622(d)(1)(A). Under the terms of the proposed consent decrees, Brook Village and Centerdale Manor would make payments totaling approximately $3.8 million.[5] The consent decrees also require Brook Village

---

[3] EPA expects to issue the Record of Decision ("ROD") in 2007. The ROD is the vehicle by which the EPA selects a remedial action, or long-term solution, to address the release or threatened release of hazardous substances at or from the Site. The ROD will also provide an estimate of the costs of cleaning up the Site. Presently, the United States has incurred over $14.5 million in unreimbursed costs to clean up the Site. The United States stated in a hearing on April 3, 2006, that total costs could possibly reach as high as $50 million.

[4] After the United States informed the Court of its intent to lodge the consent decrees, notice of the decrees was published in the Federal Register, 70 Fed. Reg. 30483 (May 26, 2005), thereby commencing a thirty-day public comment period. 42 U.S.C. § 9622(d)(2). The United States received five sets of comments, including a supplemental comment three months after the comment period had closed. The State of Rhode Island received one comment. The United States submitted EPA's Responsiveness Summary, which contains responses to all submitted comments, including concerns raised by Emhart in its objection to the proposed consent decrees.

[5] Brook Village would make payments totaling $1,451,936. Of this amount, $1,197,781.12 would be paid to the United States, $104,154.88 would be paid to the State of Rhode Island, and $150,000 would be paid to an escrow account to cover Brook Village's ongoing obligations under previous enforcement orders. Brook Village will also remit to the United States 75% of the indemnity portion of any insurance recoveries, minus reasonable attorney fees and litigation expenses.
    Centerdale Manor would make payments totaling $2,311,364. Of this amount, $1,988,454.88 would be paid to the United States, $172,909.12 would be paid to the State of Rhode Island, and $150,000 would be paid to an escrow account to cover Centerdale Manor's ongoing obligations under previous enforcement orders. Centerdale Manor is required to remit 100% of any insurance recoveries, minus reasonable attorney fees and litigation expenses.

and Centerdale Manor to use their properties as affordable assisted living facilities for another

forty years.  In exchange, the proposed consent decrees would release the Defendants from all

claims by the United States for cleanup costs and natural resource damages, and would provide

contribution protection from other non-settling PRPs.

The proposed consent decrees are based on negotiations between EPA, Rhode Island

Housing, Brook Village, and Centerdale Manor and represent EPA's determination that Brook

Village and Centerdale Manor have a limited ability to pay while continuing to operate

affordable housing facilities for elderly Rhode Island residents.  Brook Village and Centerdale

Manor are obtaining their settlement payments by refinancing their properties through Rhode

Island Housing, which will obtain the funds for the loans through the sale of taxable bonds.

Rhode Island Housing made the initial determination of the maximum amount of money that was

available from the Defendants for settlement.  EPA retained Dr. Joan K. Meyer ("Meyer") to

review the financial condition of Brook Village and Centerdale Manor, the proposed refinancing

transactions, and to determine whether the refinancing proposal would generate the maximum

contribution toward response costs.  Meyer confirmed Rhode Island Housing's determination of

the amounts Brook Village and Centerdale Manor could contribute, and concluded that it was

unlikely that either of the Defendants would be able to make ongoing contributions to the

cleanup if the entities continued to perform at the same financial level they had in the past.

Additionally, EPA determined that Brook Village and Centerdale Manor are differently situated

than the other PRPs at the Site; both Defendants purchased their property after all industrial

operations had ceased; neither sent to or stored hazardous waste at the Site; and both operate

subsidized low-income housing for the elderly.  As a matter of public policy, EPA believes the

6

proposed consent decrees are therefore appropriate.

On February 22, 2006, Emhart filed a motion to intervene under Rule 24 of the Federal Rules of Civil Procedure. The United States, Brook Village, and Centerdale Manor all objected to Emhart's motion. Emhart was permitted limited intervention under Rule 24(b) on April 3, 2006. Emhart subsequently filed an objection to the United States' motion to enter the two consent decrees. Emhart claims that the consent decrees are procedurally and substantively unfair, unreasonable, and inconsistent with the purposes of CERCLA. In essence, Emhart's principal argument is that the amount of money the United States will obtain through the settlement with Brook Village and Centerdale Manor is insufficient. Emhart contends that the Defendants could pay more than the proposed amount of the settlement.

### III. Discussion

"[I]t is the policy of the law to encourage settlements. That policy has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." Cannons, 899 F.2d at 84 (citations omitted). Sophisticated actors engaged in arm's length negotiations "know how to protect their own interests, and they are well equipped to evaluate risks and rewards." Charles George Trucking, Inc., 34 F.3d at 1088. In this instance, the public policy favoring settlements is reflected in the governing statute.

Congress enacted CERCLA to ensure that hazardous waste sites around the country would be cleaned up promptly and that those responsible for the contamination would pay the costs of the cleanup. See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074,

1081 (1st Cir. 1986). "Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal." Id. One of these "tools" is the ability to negotiate a settlement with a PRP for the costs of a cleanup or the performance of cleanup activities, as authorized by the 1986 amendments to CERCLA known as SARA (the Superfund Amendments and Reauthorization Act of 1986). See 42 U.S.C. § 9622. "Perhaps mindful of the huge resources going into the transactions costs of CERCLA litigation, rather than to remediating the sites, Congress sought in SARA to encourage earlier resolutions by agreement." United States v. Charter Int'l Oil Co., 83 F.3d 510, 520 (1st Cir. 1996) (footnote omitted). These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste." United States v. DiBiase, 45 F.3d 541, 546 (1st Cir. 1995).

Against this backdrop, the Court reviews the proposed consent decrees only to satisfy itself that the settlement is fair (both procedurally and substantively), reasonable, and consistent with the purposes that CERCLA is intended to serve. See Cannons, 899 F.2d at 85. While exercising its independent judgment, the Court "must defer heavily to the parties' agreement and the EPA's expertise." Charles George Trucking, Inc., 34 F.3d at 1085. Recognizing the "amorphous quality" of the criteria a district court is asked to use in evaluating a proposed consent decree, the First Circuit has instructed district courts to "take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties . . . ." Cannons, 899 F.2d at 85-86.

8

## A. Procedural Fairness

In evaluating the procedural fairness of a proposed consent decree, "a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Cannons, 899 F.2d at 86 (citations omitted). Generally, the requirement of procedural fairness is satisfied if the proposed settlement is negotiated at arm's length and is conducted forthrightly and in good faith. See id. at 86-87. Here, Emhart argues that the proposed consent decrees are procedurally unfair because it was not included in the negotiations between EPA and the Defendants, and did not receive any notice that negotiations were taking place.

Initially, it is worth noting that the parties to the proposed settlement devoted more than a year to the negotiations. The United States and the Defendants had adverse interests and vigorously discussed the facts of the case, the parties' legal positions, and ultimately the settlement terms. All parties to the agreement were represented by numerous and experienced counsel. Significantly, Emhart does not dispute these facts. Instead, Emhart argues that it should have had a place at the table given its record of compliance with EPA's efforts at the Site. The Court, however, finds no support for Emhart's position.

On the contrary, the First Circuit has stated that "[t]he CERCLA statutes do not require the agency to open all settlement offers to all PRPs . . . [s]o long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses." Id. at 93. "After all, 'divide and conquer' has been a recognized negotiating tactic since the days of the Roman Empire, and in the absence of a congressional directive, [a court] cannot deny the EPA use of so conventional a tool." Id. (footnote omitted). The Court finds nothing improper about EPA choosing to enter

9

into separate negotiations with Brook Village and Centerdale Manor, especially in light of EPA's determination that the Defendants, unlike Emhart and the other industrial PRPs, had no role in bringing hazardous waste to the Site.

Additionally, Emhart's argument that it was denied a role in the settlement process is further weakened by the fact that it was afforded an opportunity to comment on the proposed consent decrees during the public comment period. As required by Section 122(d)(2)(B) of CERCLA, 42 U.S.C. § 9622(d)(2)(B), Emhart was provided with a chance to comment on the proposed settlement, and Emhart took full advantage of this opportunity by submitting two sets of comments, including one after the public comment period had ended. The fact that the United States did not ultimately adopt Emhart's adverse comments, does not mean that Emhart was denied a chance to participate in the process of finalizing the proposed consent decrees.

Emhart's argument that it was entitled to notice of the negotiations is also without merit. In Cannons, the First Circuit, in considering whether EPA was required to give advance notice of a PRP's eligibility to join a settlement, stated that "the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes." 899 F.2d at 93. Given the wide latitude conferred on EPA and its negotiating strategy, the Court can find no impropriety in EPA's decision not to inform Emhart that it was engaged in negotiations with Brook Village and Centerdale Manor regarding a potential settlement.

The Court finds that EPA conducted the negotiations with Brook Village and Centerdale Manor forthrightly and in good faith; the ensuing consent decrees are the product of negotiations conducted at arm's length and between sophisticated parties. Furthermore, Emhart was given the

opportunity to comment on the proposed settlement, and took full advantage of this opportunity.

The United States was under no obligation to include Emhart in its negotiations with the

Defendants, nor was it required to give Emhart notice that any such negotiations were taking

place. Based on the foregoing, the Court concludes that the proposed consent decrees more than

adequately fulfill the requirements of procedural fairness.

## B. Substantive Fairness

"Substantive fairness introduces into the equation concepts of corrective justice and

accountability: a party should bear the cost of the harm for which it is legally responsible." Id. at

87. Fairness, however, is an elusive concept. See Charles George Trucking, Inc., 34 F.3d at

1089. Generally, what is a "fair" settlement of a given PRP's liability depends on a balancing of

factors, including 1) the financial condition of the PRP, 2) the timing of the settlement, and 3) the

PRP's contribution to a site's contamination. See United States v. Bay Area Battery, 895 F.

Supp. 1524, 1531 (N.D. Fla. 1995). In examining these factors, the Court is mindful of the fact

that "[t]he calculation of liability and the allocation of that responsibility is specially within the

scope of the Agency's and parties' expertise." Davis, 261 F.3d at 24. "'As long as the data the

EPA uses to apportion liability for purposes of a consent decree falls along the broad spectrum of

plausible approximations, judicial intrusion is unwarranted . . . .'" Id. (quoting Cannons, 899

F.2d at 88).

### 1. The Financial Condition of Defendants

The proposed consent decrees are premised on Brook Village and Centerdale Manor

paying the United States by refinancing their property through new long-term mortgages funded

by Rhode Island Housing.  The amount negotiated represents the determination of both Rhode Island Housing and EPA of the maximum amount of money available to the Defendants by refinancing their property, while still continuing to operate affordable housing facilities for the elderly.  Rhode Island Housing and EPA put that amount at roughly $3.8 million.  The heart of Emhart's objection to the proposed settlement is the assertion that EPA erred in determining that this was the maximum amount of money Brook Village and Centerdale Manor could afford to contribute to the cleanup activities at the Site.  Emhart's financial analysis places this figure closer to $7 million.  For the reasons set forth below, the Court finds EPA's determination of the Defendants' limited ability to pay to be both rational and supported by the record.

The terms of a settlement under CERCLA should be based upon "some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done."  Cannons, 899 F.2d at 87.  The United States, however, "must be afforded leeway to depart from an apportionment formula to account for factors not amenable to regimented treatment."  Bay Area Battery, 895 F. Supp. at 1529 (citing Cannons, 899 F.2d at 88).  One factor the United States may consider in allocating responsibility among PRPs is a PRP's financial health, or more precisely, a PRP's "ability to pay."  See 42 U.S.C. §§ 9622(e)(3)(A), (f)(6)(B), (g)(7).  "While certain PRPs have deep pockets and can afford to shoulder their full share of liability for a site's cleanup, other PRPs simply do not have the resources to pay their share."  Bay Area Battery, 895 F. Supp. at 1529.

When the United States enters into what it calls an "ability to pay" decree, it seeks to avoid settlements that will force businesses into bankruptcy or require them to sell off major

12

assets. See id. "In this fashion, the [United States] will recover some of its past costs while the PRPs are spared financial ruin." Id. at 1529. As EPA itself notes, "ignoring a PRP's ability to pay may, in certain situations, not only impose an undue financial hardship on the PRP but may also reduce or eliminate important benefits that the PRP provides to the community." EPA, General Policy on Superfund Ability to Pay Determinations, at 3 (Sept. 30, 1997) ("ATP Guidance"). In allocating responsibility among the PRPs at the Site, EPA appropriately considered the financial health of Brook Village and Centerdale Manor and concluded that the proposed settlement represents the maximum amount of money the Defendants could contribute to the cleanup.

Emhart disagrees with EPA's financial analysis and insinuates that the proposed consent decrees compromise the goal of accountability by setting too modest a price tag on the settlement. The Court, however, has carefully reviewed the statements of the opposing financial experts, and concludes that the United States' settlement amounts for Brook Village and Centerdale Manor are fair and rational. For example, Emhart argues that if Rhode Island Housing had used a lower interest rate in calculating the new mortgages for Brook Village and Centerdale Manor, it could have yielded an additional $598,116 for contribution to the cleanup.[6] The consent decrees, however, expressly state that the payment amounts in the refinancing shall "[use] the Prevailing Interest Rate in effect at the time of closing." Section VI, ¶ 5. In essence, what this means is that the consent decrees will automatically update the payment amounts to

---

[6] Rhode Island Housing used an interest rate of 8.5% in calculating the loans it could provide Brook Village and Centerdale Manor by refinancing their existing mortgages. Emhart argues that Rhode Island Housing should have used the current interest rate for a thirty-year loan funded from taxable bonds, the type of loan Rhode Island Housing is providing to Defendants, which is 7.9%.

reflect the prevailing interest rate at the time of closing.  If the prevailing interest rate at the time

of closing is lower than the interest rate Rhode Island Housing used to calculate the new

mortgages, the amount of money available for Defendants to contribute will increase.  EPA

argues that Emhart fails to recognize that the consent decrees do not require the payment of a

fixed amount.  Instead, EPA claims the consent decrees are designed to recapture the maximum

amount of money the Defendants will receive from the refinancing transaction, minus the

amounts Rhode Island Housing and EPA have determined the Defendants will need to stay in

business.

Emhart also argues that additional money could be contributed to the settlement from the

replacement and operating reserves of Centerdale Manor.  These reserves, however, are funds

that Rhode Island Housing requires mortgagees to set aside to cover unexpected financial needs.

Additionally, to the extent that either of the Defendants' reserves exceed the amounts required to

be set aside by Rhode Island Housing, EPA asserts that the consent decrees require any excess be

paid to the United States as the "maximum equity available from the Preservation Refinancing

mortgage transaction . . . ."  Section VI, ¶ 5.  Again, EPA argues that the consent decrees take

into account the "additional" funds Emhart purports to discover.

Emhart makes numerous such arguments disputing the financial analysis of EPA's expert,

and invites the Court to look into the financial health of the Defendants in the most minute and

excruciating detail.  Alternatively, Emhart asks the Court to scrutinize the details of the

refinancing transaction.  The Court, however, declines Emhart's invitation to be drawn into, what

in essence, is a battle between the parties' accountants over the methodology and figures used to

arrive at EPA's numbers.  It is precisely this level of second-guessing the First Circuit

14

discouraged in <u>Cannons</u> when it stated "that the judiciary [should] take a broad view of proposed settlements, leaving highly technical issues and relatively petty inequities to the discourse between parties . . . ." 899 F.2d at 85-86.

In addition to Emhart's specific arguments concerning the amount of the proposed settlement, however, Emhart also contends that EPA should have evaluated the financial resources of the Defendants' general partners. Emhart claims that by overlooking the "deep pockets" of the general partners, EPA disregarded, or violated, its own "ability to pay" policy. This argument is unavailing. Emhart cites EPA's own guidance documents as evidence that EPA acted in a manner inconsistent with the "requirements" of its policies. EPA's internal guidance, however, states that it "is not a rule and does not create any legal obligations. Whether and how EPA applies the guidance to any particular site will depend on the facts at the site." EPA, <u>Interim Guidance on the Ability to Pay and De Minimis Revisions to CERCLA § 122(g) by the Small Business Liability Relief and Brownfields Revitalization Act</u>, at 10 (May 17, 2004) ("Interim Guidance"); <u>see</u> <u>also</u> <u>Brock v. Cathedral Bluffs Shale Oil Co.</u>, 796 F.2d 533, 537 (D.C. Cir. 1986) (discussing the difference between a binding substantive regulation and a general policy statement). After a careful review, the Court finds EPA's ATP Guidance and Interim Guidance to be sufficiently flexible to accommodate any deviation EPA found it necessary to make in the instant case.

Furthermore, it is well-settled that an "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985) (citations omitted). A decision by an agency not to enforce "often involves a complicated balancing of a number of

factors which are peculiarly within its expertise." Id. Nonetheless, EPA and Rhode Island

Housing offer a rational explanation for their decision not to pursue the general partners for

contribution to the proposed settlement.  Section 8 affordable housing is a unique public/private

partnership, the success of which depends on attracting private investment to build and maintain

affordable housing projects, such as Brook Village and Centerdale Manor.  It is not easy

attracting sufficient private interest; this is a highly regulated, long-term investment.  Holding

investors in such projects individually responsible for contamination of these properties prior to

their ownership would have a potential "chilling effect" on the willingness of the private market

to invest in these developments.  See Declaration of Carol Ventura, Director, Rhode Island

Housing, at ¶ 27.  Given that the United States' decision not to pursue the general partners is

consistent with the flexibility afforded EPA by its internal guidance, and generally within the

discretion of the United States, the Court finds that the decision does not affect the substantive

fairness of the proposed consent decrees.

     The Court also notes that the United States offers an alternative rationale for its decision

to settle with these particular PRPs, other than their ability to pay.  Section 122(a) of CERCLA,

42 U.S.C. § 9622(a), authorizes settlements "in the public interest."  The United States maintains

that the Defendants are in a position that is fundamentally different than the other PRPs at the

Site.  It is undisputed that Defendants came to the Site after all industrial activity ceased, and are

liable under CERCLA based solely on their status as property owners.  42 U.S.C. § 9607(a)(1).

As such, the Defendants may have substantial defenses to liability under CERCLA, 42 U.S.C.

9607(b), which is discussed more fully infra at Part C.  Brook Village and Centerdale Manor

both operate affordable housing for the elderly.  The Defendants have already paid approximately

$1 million in cleanup costs.  The Defendants are willing to enter into new long-term mortgages, as well as contribute all of their available equity, to finance the proposed settlement. Significantly, the Defendants have also agreed to continue to operate subsidized low-income housing for another forty years.  In light of these facts, EPA has determined that it is in the public interest to enter into the proposed consent decrees.

### 2. Timing of the Settlement

Emhart makes several arguments that the United States' proposed settlements with Brook Village and Centerdale Manor are premature.  For example, Emhart claims that EPA had insufficient information about the total costs of the cleanup when it entered into the proposed consent decrees.  EPA stated at a hearing on April 3, 2006, that the total costs of the cleanup could reach as high as $50 million.  EPA, however, does not plan to select a remedy or provide final cost estimates until some time in 2007.  Emhart therefore argues that until the United States is able to determine the total amount of the cleanup costs, any settlement with the Defendants is premature and the reasonableness of the consent decrees cannot be adequately gauged.

Emhart fails to recognize the realities of CERCLA litigation; incomplete information, muddled records, and rough approximations of responsibility are the norm.  See Charles George Trucking, Inc., 34 F.3d at 1088-89; see also Davis, 261 F.3d at 24 ("data on the total extent of harm and the respective liabilities of various PRPs are often unavailable.").  Such difficulties, however, will not preclude a court from entering a consent decree.  Davis, 261 F.3d at 24 (citing Charles George Trucking, Inc., 34 F.3d at 1089).  As the First Circuit stated, "a district court should give the EPA's expertise the benefit of the doubt when weighing substantive fairness -

particularly when the agency, and hence the court, has been confronted by ambiguous, incomplete, or inscrutable information." Cannons, 899 F.2d at 88. "[I]t would disserve a principle end of the statute - achievement of prompt settlement and a concomitant head start on response activities - to leave matters in limbo until more precise information was amassed." Id.

Furthermore, it is worth noting that the proposed consent decrees come almost seven years after EPA identified the Defendants as PRPs. During those seven years, EPA has studied the Site and ordered several interim response activities. EPA has also determined that the proposed settlement represents the maximum amount that the Defendants are able to pay and still offer affordable housing to elderly residents. This determination is not, nor does it need to be, premised on the knowledge of the total cleanup costs. See Charles George Trucking, Inc., 34 F.3d at 1088-89. In light of the above, the Court does not find any of Emhart's arguments that the proposed consent decrees are premature to be persuasive.

### 3. Contribution to the Site's Contamination

Emhart argues that there is evidence that the Defendants exacerbated the contamination at the Site during the construction of their apartment buildings. Emhart also alleges that EPA failed to consider such evidence in allocating responsibility under the proposed consent decrees. As an initial matter, the Court finds that EPA did in fact consider the actions of the Defendants in evaluating whether to enter into the proposed settlement. See U.S. Memorandum In Support of Motion to Enter Consent Decree, Response to Comment No. 5, at 30-31 ("U.S. Memorandum"). Even if Emhart's assertion that Defendants exacerbated the contamination at the Site is accurate, EPA found that the Defendants' "contribution to [the] contamination at the Site was incidental to

18

the construction of affordable housing for the elderly whereas the remaining PRPs were responsible for the initial disposal of hazardous substances at the Site." Id. Moreover, EPA found that the proposed settlement generated the maximum amount of money the Defendants could contribute to the future cleanup activities at the Site. The Court is cognizant of the fact that EPA's allocation of responsibility "should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." Cannons, 899 F.2d at 87. The Court therefore concludes that EPA's division of responsibility between Brook Village and Centerdale Manor, on the one side, and the industrial PRPs, on the other, was both plausible and reasonable.

## C. Reasonableness

The standard for determining whether a proposed settlement is reasonable has several elements: "the effectiveness of the decree as a vehicle for cleaning the environment; providing satisfactory public compensation for actual (and anticipated) costs of remediation; and accounting for the relative strength of the parties' litigating positions and foreseeable risks of loss." Davis, 261 F.3d at 26 (citing Cannons, 899 F.2d at 89-90). The stronger the EPA's case is against the settling parties, the more it should demand. See Cannons, 899 F.2d at 90. On the other hand, if the outcome of litigation may be uncertain or the prospect of recovery may be poor, "a reasonable settlement will ordinarily mirror such factors." Id.

With these principles in mind, the Court finds the proposed consent decrees in this case to be reasonable. While the terms of the proposed consent decrees relieve Brook Village and

19

Centerdale Manor from conducting any further cleanup activities at the Site, the United States is still recovering money to compensate its past costs. "These funds will further the cleanup at the Site and help replenish the Superfund. In this fashion, the settlement assists the [United States] in cleaning up the environment here and elsewhere." Bay Area Battery, 895 F. Supp. at 1534.

Emhart argues that the proposed settlement can not possibly be reasonable given that the United States is recovering only approximately $3.8 million out of an estimated $50 million in future cleanup costs. Emhart believes the Defendants could afford to pay closer to $7 million. Emhart, however, fails "to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." Charles George Trucking, Inc., 34 F.3d at 1087. Both Brook Village and Centerdale Manor raise substantial defenses to liability under CERCLA. For example, Brook Village asserts that it is an innocent landowner under Section 101(35) of CERCLA, 42 U.S.C. § 9601(35). This affirmative defense was meant to protect landowners "who, innocently and in good faith, purchase property without knowledge that a predecessor in the chain of title had allowed hazardous substances to be disposed on the property." United States v. Domenic Lombardi Realty, Inc., 290 F. Supp. 2d 198, 208 (D.R.I. 2003). Consequently, Brook Village has filed a petition, pursuant to Section 106(b) of CERCLA, to recover $575,000 in costs it incurred in complying with the EPA's second UAO. 42 U.S.C. § 9606(b). As the United States acknowledges, "[i]f successful, Brook Village would receive reimbursement of up to $575,000 . . . and EPA would likely be foreclosed from seeking any other contribution from Brook Village." U.S. Memorandum at 17. Although the United States believes that it would ultimately prevail in any such litigation, it was appropriate to consider the protracted nature and risk of litigation versus the certainty of an immediate payment in negotiating the proposed

20

settlement.

Additionally, the United States obtained the best deal it could get under the circumstances. Given the possible defenses raised by Brook Village and Centerdale Manor, the United States' prospect of recovery after litigation is, at best, uncertain here. "Again, the limited financial resources of these PRPs must be emphasized." Bay Area Battery, 895 F. Supp. at 1534. Although the United States believes it could likely obtain a judgment against these parties, "the costs of litigating and levying against the parties would likely outstrip the ultimate recovery. By settling with these PRPs now, the [United States] insures what little money the settlors have to contribute will be used to clean up the environment rather than pay attorneys." Id. In light of these considerations, the Court finds the proposed settlement to be reasonable.

## D. Fidelity to the Statute

"It is crystal clear that the broad settlement authority conferred upon the EPA must be exercised with deference to the statute's overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities." Cannons, 899 F.2d at 91. Consideration of the extent to which the proposed consent decrees are consistent with these principles involves matters of fairness and reasonableness. Id. "The three broad approval criteria were not meant to be mutually exclusive and cannot be viewed in majestic isolation." Id. Keeping these precepts in mind, the Court finds the proposed settlement to be consistent with the goals of CERCLA.

Although Emhart argues to the contrary, the United States is holding both Brook Village and Centerdale Manor accountable for their limited contribution to the contamination at the Site.

21

The Defendants have no responsibility for the initial disposal of hazardous substances at the Site; they currently provide, and for the next forty years will continue to provide, affordable housing for Rhode Island's elderly citizens. Despite these equitable factors, the EPA did not enter lightly into the "ability to pay" decrees before the Court. Both EPA and Rhode Island Housing carefully and extensively examined the financial positions of Brook Village and Centerdale Manor. After analyzing the financial information of the Defendants, the United States arrived at payment figures that in its estimation were the largest it could demand from these parties. Contrary to Emhart's assertions, the settling Defendants are not getting a "good deal," but rather, the United States is extracting what it can from them.

The proposed settlement allows the United States to recover approximately $3.8 million. These funds will compensate the United States for its past costs and will further the cleanup activities at the Site. In exchange for this immediate and certain payment, the United States has agreed to release Brook Village and Centerdale Manor from liability under CERCLA for the cleanup. The United States has also agreed to provide contribution protection to the Defendants for any claims raised by the non-settling PRPs, such as Emhart. The proposed consent decrees appropriately account for the risks inherent in continued litigation with the Defendants, and the equitable differences between Brook Village and Centerdale Manor, on the one hand, and the industrial PRPs, on the other. To the extent that Emhart disputes the nuts and bolts of the underlying financial details of the proposed settlement, the Court is reminded that it "must look at the big picture, leaving interstitial details largely to the agency's informed judgment." Id. at 94. Mindful of this "big picture," the Court finds the proposed consent decrees to be fair, reasonable, and consistent with the purposes of CERCLA.

## IV.  Conclusion

For the foregoing reasons, the motion for entry of the proposed consent decrees is

GRANTED.


SO ORDERED.

Mary M. Lisi
United States District Judge
November _6_, 2006